J-S47008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| HUGO M. SELENSKI, | |
| Appellant | No. 904 MDA 2015 |

Appeal from the Judgment of Sentence March 27, 2015
In the Court of Common Pleas of Luzerne County
Criminal Division at No(s): CP-40-CR-0002700-2006

BEFORE:  SHOGAN, LAZARUS, and JENKINS, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED AUGUST 11, 2016**

Hugo M. Selenski ("Appellant") appeals the judgment of sentence imposed after a jury convicted him of first degree murder, conspiracy, solicitation, robbery, and theft.  We affirm.

A prior panel of this Court summarized the background of this case:

> The Commonwealth submitted affidavits of probable cause to the trial court in conjunction with disposition of pre-trial motions, which summarized the Commonwealth's proffered evidence as to the homicides. The affidavits were executed on May 19, 2006, by detectives from the Luzerne County District Attorney's Office, as well as by law enforcement officers from the Pennsylvania State Police.
>
> According to the affidavits, homicide victim Michael Kerkowski, Jr., a licensed pharmacist and owner of a pharmacy, was arrested in April 2001 and subsequently convicted of selling controlled substances illegally. He failed to appear at his sentencing hearing on May 14, 2002, and it was presumed that he had absconded. On May 6, 2002, Gerry Kerkowski, Michael's mother, reported that Michael and Tammy Fassett were both missing. In December 2002, Michael Kerkowski, Sr., reported an

assault and robbery of his residence. He stated that his son, Michael, had entrusted $60,000 to him in April 2001, and the money was placed in an unused vent in the basement. Only he and Michael knew of the money and its location. During Michael's trial for illegal sale of narcotics, he introduced [Appellant] to Kerkowski, Sr., as his best friend, and advised his father to trust [Appellant]. Kerkowski, Sr. also related that in July 2002, he met with [Appellant], who said that he had spoken with Michael subsequent to May 3, 2002, and that Michael had not fled, but needed $30,000 to aid in his legal defense. [Appellant] also indicated that he knew about the $60,000 hidden in the basement, prompting Kerkowski, Sr. to give [Appellant] the requested $30,000.

According to Kerkowski, Sr., in June or July 2002, [Paul] Weakley, using the alias of "Eric," approached him and asked for $10,000 in order to repair a computer so he could keep in contact with Kerkowski, Jr., but Kerkowski, Sr., refused to tender the money unless he could speak with his son. Kerkowski, Sr., then contacted [Appellant] who told him not to give money to "Eric." In August 2002, [Appellant] again contacted Kerkowski, Sr., who gave him an additional $30,000. Kerkowski, Sr., asked if he could speak to Michael, to which [Appellant] responded he would see what he could do. In September or October 2002, [Appellant] again met with Kerkowski, Sr., and asked for more money. Kerkowski, Sr., refused to provide any further funds until he could talk to Michael. At that time, [Appellant] produced a pistol, demanded money and fired the weapon, whereupon Kerkowski, Sr., gave [Appellant] $40,000.

Beginning in June 2003, Weakley provided statements to District Attorney detectives implicating [Appellant] as well as himself in the homicides of Kerkowski, Jr. and Fassett. Weakley denied being present at the homicides, but stated that he helped [Appellant] rebury the bodies on or about May 6, 2002, in the grounds at 479 Mt. Olivet Road, Kingston Township, which was in the process of being conveyed to [Appellant] and Tina Strom, [Appellant's] girlfriend.

On June 5, 2003, a search warrant was served at the Mount Olivet property. Weakley accompanied the authorities to the property and pointed out the burial site.[3] As a result, Kerkowski, Jr.'s and Fassett's remains were discovered, along

with flex ties and duct tape. An autopsy report found the cause of death as strangulation, and the manner of death as homicide.[4]

> [3] Weakley had also accompanied the authorities to the field behind Dallas High School, where the bodies had first been purportedly buried by [Appellant] and another person. Weakley could not locate the purported burial site. Subsequent investigations by local and federal forensic experts could not locate a burial site in the field behind the Dallas High school.
>
> [4] A person named "Reese" provided information about a meeting between [Appellant] and Kerkowski Sr[.], where Kerkowski, Sr., refused to give [Appellant] money because he did not know if his son was alive. Another person, named "Samson," advised that in April or May 2003, [Appellant] offered him $20,000 if he would help [Appellant] "dispose" of a pharmacist who had been arrested for selling oxyco[n]tin. Earnest Culp, who had rented a trailer on the Mt. Olivet Road property prior to [Appellant's] purchase, told investigators that he encountered [Appellant] and Weakley on the property near a freshly dug area, and that [Appellant] said he wanted to place a gasoline tank in the area.

Investigators further discovered that Weakley had purchased digging tools from a hardware store on May 4, 2002. Weakley also purchased a cell phone and was in constant communication with [Appellant] from May 3, 2002, through May 5, 2002, about 36 total calls. Contrary to Weakley's statements, investigators also discovered that Weakley did not work on May 3, 2002.

*Commonwealth v. Selenski*, 972 A.2d 1182, 1184–1185 (Pa. Super. 2009) (one footnote omitted).

Following a joint county and state criminal investigation into the deaths of Michael Kerkowski, Jr. and Tammy Fassett, the Commonwealth charged Appellant on May 19, 2006, with two counts each of homicide,

conspiracy (homicide), solicitation, robbery, conspiracy (robbery), and one count of theft. After years of preliminary proceedings, appeals, changes of counsel and jurists, discovery, and extensions, Appellant proceeded to a jury trial in January of 2015, which resulted in guilty verdicts on all but two of the counts.[1] Certified Record Docket Entry 423. Following a penalty hearing on February 17, 2015, the jury returned verdicts of life imprisonment on the dual first-degree-murder convictions. Certified Record Docket Entry 425.

The trial court sentenced Appellant on March 27, 2015, to consecutive terms of life imprisonment without possibility of parole, followed by fifty-six to 120 years of incarceration. Certified Record Docket Entry 545. Appellant filed a post-sentence motion on April 6, 2015, regarding restitution. Certified Record Docket Entry 549. The trial court scheduled a hearing for April 29, 2015, where Appellant's post-sentence motion was resolved by stipulation. Certified Record Docket Entry 554. This appeal followed. Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following questions for our consideration:

I. Whether [Appellant's] right to counsel of choice, pursuant to the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution, was violated and a new trial should be granted because the trial court granted the Commonwealth's motion to disqualify [Appellant's] chosen counsel for a purported conflict that he waived?

---

[1] The jury acquitted Appellant of solicitation to commit homicide and conspiracy to commit robbery. Certified Record Docket Entry 423.

II. Whether a new trial is warranted because the Commonwealth failed to disclose material and vital impeachment evidence regarding Christina Strom, namely that the Commonwealth had agreed to advocate for her at her delayed federal sentencing hearing and that a motion to reduce her sentencing exposure based upon her cooperation had been filed back in 2007?

III. Whether a new trial is warranted because the trial court failed to provide after the introduction of alleged co-conspirator Paul Weakley an appropriate and timely cautionary instruction that his guilty plea to the homicide charges and the Goosay charges could not be used as any evidence against [Appellant]?

IV. Whether the trial court committed reversible error when it granted the Commonwealth's motion in limine to introduce at trial the former preliminary hearing testimony of an unavailable witness, Ernest Culp, as it violated [Appellant's] right to confrontation under both the Pennsylvania and United States Constitutions?

V. Whether the trial court committed reversible error when it permitted the Commonwealth's forensic pathologist to offer expert testimony regarding alleged blunt force trauma on the body of Michael Kerkowski that was based upon hearsay facts supplied by chief prosecution witness Paul Weakley where such statements are not the type reasonably relied upon by experts in the same field?

VI. Whether the trial court committed reversible error when it denied a defense request for a mistrial after key prosecution witness Christina Strom testified that [Appellant] went to the police station to "talk about a robbery" after the Commonwealth was specifically admonished from [sic] introducing said testimony?

VII. Whether the trial court committed reversible error by permitting a sitting Common Pleas Court judge to testify on behalf of the Commonwealth because such testimony was irrelevant and highly prejudicial as it gave the appearance of using the prestige of his office to advance the credibility of and bolster the Commonwealth's case?

Appellant's Brief at 4–5.

Appellant first challenges the trial court order granting the Commonwealth's motion to disqualify lead defense counsel Shelley Centini, Esq. and defense investigator James Sulima. Appellant's Brief at 19. The Commonwealth's motion averred, in relevant part, as follows:

> 2. The Commonwealth became aware of the matters which related to the attached criminal charges and referred same to the Office of the Attorney General due to the conflict with prosecuting the criminal homicide at bar.
>
> 3. Subsequently, the Court was made aware of a pending grand jury investigation directly related to the instant case.
>
> 4. On January 27, 2014, as a result of that referral and following the grand jury investigation, the Office of Attorney General filed criminal charges directly related to the instant criminal homicide trial against defendant's counsel, Shelley L. CENTINI, Esquire, for criminal acts allegedly committed during her participation in the instant case. A copy of said charges and supporting affidavit are attached hereto, made a part hereof and labeled Exhibit "A."
>
> 5. Further, on January 27, 2014, as a result of the referral by the Office of the District Attorney and following the grand jury investigation, the Office of Attorney General filed criminal charges directly related to the instant criminal homicide trial against defendant's investigator, James F. SULIMA, for criminal acts allegedly committed during his participation in the instant case. A copy of said charges and supporting affidavit are attached hereto, made a part hereof and labeled Exhibit "B."
>
> 6. Further, on January 27, 2014, as a result of the referral by the Office of the District Attorney and following the grand jury investigation, the Office of Attorney General filed criminal charges directly related to the instant criminal homicide trial against defendant, Hugo M. SELENSKI, for criminal acts allegedly committed during the pendency of his homicide case.

A copy of said charges and supporting affidavit are attached hereto, made a part hereof and labeled Exhibit "C."

7.     Further, on January 27, 2014, as a result of the referral by the Office of the District Attorney and following the grand jury investigation, the Office of Attorney General filed criminal charges alleging, *inter alia*, that defendant's counsel, Shelley L. CENTINI, Esquire, and investigator, James F. SULIMA, conspired with double-homicide defendant, Hugo M. SELENSKI, to commit criminal acts as set forth in the attached affidavits during the pendency of this homicide case.[2]

8.  It is the desire and intent of the Commonwealth to use the information set forth in the attached affidavits in its case-in-chief against defendant, Hugo M. SELENSKI, for homicide, as said information is relevant and directly related to the charges in the above-captioned matter and further related to evidence of his consciousness of guilt.

9.     Additionally, as a result of the facts set forth in the affidavits, it is apparent that Attorney CENTINI and Mr. SULIMA have now made themselves witnesses in the Commonwealth's case as to the foregoing.

* * *

11.  The Commonwealth respectfully submits that CENTINI can no longer represent defendant in the instant matter.

12.     Similarly, the Commonwealth respectfully submits that SULIMA should not be permitted to continue as defendant's investigator.

_____

[2] As a result of the grand jury investigation, the Attorney General charged Attorney Centini, Investigator Sulima, and Appellant with intimidation of witnesses, conspiracy (witness intimidation), theft by deception, conspiracy (theft by deception), perjury, conspiracy (perjury), solicitation (perjury), obstructing administration of law, conspiracy (obstruction), tampering with evidence, and conspiracy (tampering with evidence).    Motion of the Commonwealth to Remove Defense Counsel and Investigator, 1/27/14, at Exhibits A, B, and C.

Motion of the Commonwealth to Remove Defense Counsel and Investigator, 1/27/14, at 1–3.

In support of its motion, the Commonwealth submitted the grand jury's findings of fact, which, in relevant part, provide as follows:

On January 6, 2012, the Luzerne County Court of Common Pleas appointed Centini to represent [Appellant] relating to charges that include criminal homicide and solicitation to commit criminal homicide. Despite her ethical obligations, the Grand Jury finds that Centini was actively engaged in unethical and criminal conduct throughout her representation of [Appellant]. Centini engaged in that conduct for improper purposes, including suborning perjury, obstructing or impairing the administration of justice, and intimidating witnesses. Centini met with at least five witnesses while continually blurring her role as [Appellant's] advocate with interests potentially adverse to those of the witness. Centini met with witnesses and solicited information or statements from them while they were represented by counsel. Centini provided witnesses with letters from [Appellant] for the purpose of intimidation and directed the witnesses to commit perjury. On at least one occasion, Centini provided a witness with money and, on another occasion, expressed to a witness that [Appellant] was angry with the witness for prior statements to police. The Grand Jury finds that these letters were drafted by [Appellant] and presented by Centini and Sulima for the specific purpose of intimidation, soliciting perjury, and obstructing justice. Centini testified that these incriminating letters were simply "lost" following this meeting. The Grand Jury finds that the statements of Centini were not truthful and were made for the purpose of keeping this body from discovering the full facts of this matter. It is the finding of this Grand Jury that the letters were hidden or destroyed to avoid prosecution for the commission of criminal acts.

* * *

James Sulima was a Pittston police officer until 2007. Since 2007, Sulima has operated as a private detective and formed JS investigation and Consulting. The Grand Jury finds that Sulima aided in the furtherance of a criminal conspiracy with Centini and [Appellant] to obstruct or impair the

- 8 -

administration of justice and to intimidate witnesses. Sulima continued his criminal conduct before the Grand Jury. It is the finding of this body that Sulima lied under oath.

Motion of the Commonwealth to Remove Defense Counsel and Investigator, 1/27/14, at Exhibits A, B, and C. Following a hearing on February 20, 2014, the trial court granted the Commonwealth's motion and removed Attorney Centini and Investigator Sulima. Certified Record Docket Entry 382.

On appeal, Appellant argues that his constitutional right to counsel was violated by the removal of Attorney Centini, with whom he had "developed a strong attorney-client relationship" over the course of two years. Appellant's Brief at 21. The Commonwealth counters that Appellant has a right to counsel, but not "to taxpayer-funded counsel of choice[.]" Commonwealth's Brief at 5.

It is axiomatic that a criminal defendant has an absolute right to counsel under the Fifth Amendment of the Constitution of the United States and Article I, Section 9 of the Pennsylvania Constitution. *Commonwealth v. Moore*, 633 A.2d 1119, 1125 (Pa. 1993); *Commonwealth v. Tyler*, 360 A.2d 617, 619 (Pa. 1975). "While an accused is constitutionally guaranteed the right to the assistance of counsel that right gives to a defendant only the right to choose, at his or her own cost, any attorney desired. Where, as here, an accused is indigent, the right involves counsel, but not free counsel

of choice." ***Commonwealth v. Abu–Jamal***, 720 A.2d 79, 109 (Pa. 1998). (citing ***Commonwealth v. Segers***, 331 A.2d 462, 465 (Pa. 1975)).

Upon review of the appellate briefs, the certified record, and the applicable law, we conclude that Appellant's first issue does not entitle him to relief. Contrary to Appellant's assertion, the removal of appointed counsel under the circumstances presented herein did not violate Appellant's constitutional right to the assistance of counsel. In support of our conclusion, we adopt as our own the thorough and well-reasoned analysis of the trial court. Trial Court Opinion, 9/24/15, at 8–28.

Next, Appellant argues that a new trial is warranted because the Commonwealth violated ***Brady v. Maryland***, 373 U.S. 83 (1963), by failing to disclose impeachment evidence regarding Appellant's former girlfriend and Commonwealth witness, Tina Strom. Appellant's Brief at 28. According to Appellant, the Commonwealth did not disclose that Ms. Strom would benefit from a downward departure at sentencing in her federal case if she cooperated with the Commonwealth in Appellant's case. ***Id.*** at 33. Appellant further complains that the Commonwealth "failed to disclose its tacit understanding that the Commonwealth would advocate for Ms. Strom at her federal sentencing hearing." ***Id.*** at 36. In response, the Commonwealth asserts that "[a]ny benefit Ms. Strom received was as a result of her cooperation which was known by defense." Commonwealth's Brief at 12.

In **Brady**, the United States Supreme Court held that a defendant's due process rights are violated when the prosecution withholds favorable, material evidence from the defense. To prove a **Brady** violation, the defendant bears the burden of demonstrating that: "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant." **Commonwealth v. Koehler**, 614 Pa. 159, 36 A.3d 121, 133 (2012) (citation omitted). Therefore, even if the first two prongs have been established, a defendant must establish that he was prejudiced by the failure to disclose. **See Commonwealth v. Appel**, 547 Pa. 171, 689 A.2d 891 (1997). To establish prejudice, the defendant must prove that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Id.** (citation omitted).

**Commonwealth v. Pugh**, 101 A.3d 820, 825 (Pa. Super. 2014), *appeal denied*, 117 A.3d 296 (Pa. 2015).

Upon review of the appellate briefs, the certified record, and the applicable law, we conclude that Appellant's second issue does not warrant relief. Contrary to Appellant's assertion, the record reveals that the Commonwealth did not commit a **Brady** violation.[3] In support of our conclusion, we adopt as our own the thorough and well-reasoned analysis of the trial court. Trial Court Opinion, 9/24/15, at 29–36.

---

[3] Even if the Commonwealth failed to disclose impeachment evidence, we observe that Ms. Strom testified about her federal indictment and guilty plea and defense counsel thoroughly cross-examined her regarding the terms of her plea agreement and her expectation of a benefit at her federal sentencing. N.T., 1/21/15, at 713–718, 841–843, 894, 910–912, 920, 932, 944. Therefore, Appellant could not establish "there was a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Pugh**, 101 A.3d at 825 (citation omitted).

- 11 -

In his third issue, Appellant challenges the trial court's failure to give a cautionary instruction to the jury following the testimony of co-conspirator and Commonwealth witness Paul Weakley. Appellant's Brief at 38. Appellant complains that the jury was "allowed improperly to infer that because his co-conspirator pled guilty" to a robbery in Monroe County, Appellant "must also be guilty" of the robbery charges he faced. *Id.* at 42. The Commonwealth contends that Appellant failed to preserve this issue for appeal. Commonwealth's Brief at 12. According to the Commonwealth, "defense asked about an instruction, but never objected to the insufficiency of the same. . . . In fact, the instruction was given immediately following the testimony of Weakley as requested by defense." *Id.* at 15–16.

We reiterate: "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Specifically, a party's failure to object to a curative instruction as inadequate waives a challenge to the instruction on appeal. ***Commonwealth v. Powell***, 956 A.2d 406, 421–422 (Pa. 2008).

Our review of the record confirms that defense counsel discussed an instruction regarding the jury's use of Mr. Weakley's testimony and the trial court agreed to consider whatever language defense counsel drafted. N.T., 6/21/15, at 993–995. Defense counsel did not object to Mr. Weakley's testimony about his federal and state criminal proceedings or his relationship with Appellant. *Id.* at 1008–1012, 1023–1025, 1034–1035, 1042, 1045,

1048–1051. At a sidebar during Mr. Weakley's testimony, the trial court and counsel again discussed the topic of a cautionary instruction concerning the limited use of Mr. Weakley's testimony. *Id.* at 1333–1335. Immediately after Mr. Weakley's testimony, the trial court gave the cautionary instruction specifically advising the jury on the limited use of the co-conspirator's testimony. *Id.* at 1346–1348. Appellant did not challenge the adequacy of the cautionary instruction or object to the trial court's jury charge. *Id.* at 1346–1348, 2813–2881. Thus, we conclude that Appellant has waived this issue. Pa.R.A.P. 302(a).

Appellant's fourth issue stems from the trial court's ruling less than one month before trial on the Commonwealth's motion *in limine*. Appellant's Brief at 44. The trial court allowed the Commonwealth to introduce the 2006 preliminary hearing testimony of a deceased witness, Ernest Culp.[4] Appellant presents four bases on which admission of the challenged evidence violated his Sixth Amendment right to confront witnesses: 1) the trial court "placed undue reliance on an irrelevant past ruling by Judge Muroski in 2007 permitting the introduction of Michael Kerkowski, Sr.'s preliminary hearing testimony at trial," *id.* at 49; 2) "the rules governing a preliminary hearing in Pennsylvania are grossly inadequate to offer a fair prior opportunity for cross-examination," *id.*; 3) Appellant "had different counsel at trial and at

---

[4] Mr. Culp died on September 13, 2014. Motion in Limine, 12/11/14, at Exhibit 2 (Certificate of death for Ernest Culp).

- 13 -

the preliminary hearing in 2006" which "the Pennsylvania Supreme Court found . . . to be a significant factor in determining whether a defendant's confrontation rights have been satisfied," *id.* at 50 (citing ***Commonwealth v. Wholaver***, 989 A.2d 883, 904 (Pa. 2010)); and 4) Appellant "was not furnished with Mr. Culp's criminal history nor any prior statements at the time of the preliminary hearing," *id.*

After responding to each of Appellant's first three assertions, the Commonwealth submits, "[T]he trial court correctly applied the standard in finding that Mr. Culp was unavailable and that [Appellant] had a full and fair opportunity to cross-examine him at the preliminary hearing." Commonwealth's Brief at 22. As for Appellant's fourth assertion, the Commonwealth responds that Mr. Culp did not have a criminal history and that "all reports relevant to Mr. Culp's testimony were in possession of defense at the preliminary hearing. Furthermore, . . . current counsel has not specified any fact in particular now in his possession, but not given at the preliminary hearing, that precluded a full and fair cross-examination." *Id.*

"Under both the Pennsylvania and United States Constitutions, a criminal defendant has a right to confront and cross-examine the witnesses against him." ***Commonwealth v. McCrae***, 832 A.2d 1026, 1035 (Pa. 2003); U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]");

Pa. Const. art. I, § 9 ("In all criminal prosecutions the accused hath a right ... to be confronted with the witnesses against him[.]"). "It is well-established, however, that the introduction of an unavailable witness's prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the hearing." *McCrae*, 832 A.2d at 1035. A defendant asserting a lack of a full and fair opportunity for cross examination must establish that he or she was deprived of "vital impeachment evidence." *Commonwealth v. Cruz–Centeno*, 668 A.2d 536, 543 (Pa. Super. 1995). "Vital impeachment evidence" includes prior inconsistent statements of the witness or the witness' criminal record. *Id.* at 543.

Having examined Judge Muroski's analysis of the applicable law[5] and Ernest Culp's preliminary hearing testimony, the trial court conducted the following analysis in disposing of the Commonwealth's motion *in limine*:

> In summary fashion, Mr. Culp indicated at the time of the preliminary hearing he was 57 years of age and engaged in the landscaping business. In May of 2002 Mr. Culp resided at Box 485 Mt. Olivet Road, Wyoming, Kingston Township. During early May, Mr. Culp allegedly observed an individual walking around 479 Mt. Olivet Road—an adjacent property. Mr. Culp was shown photographs identified as Commonwealth Exhibits 3 through 7

---

[5] Certified Record Docket Entry 108 (Judge Muroski Order and Opinion, 5/17/07, at 11–17); Certified Record Docket Entry 198 (Judge Muroski Order and Memorandum, 7/21/10, at 6–11).

and discussed during the course of his preliminary hearing testimony.

Mr. Culp stated that he saw [Appellant], who he had been introduced to a few weeks earlier and another individual, he later came to know as Paul Weakley. The witness stated that he observed [Appellant] holding a shovel and further observed the ground turned over as though someone had been "digging".

Mr. Culp further recounted alleged statements attributed to [Appellant]. The first alleged statement occurred on the date the aforementioned observations were made and the second approximately four to six weeks later.

As previously indicated, counsel for both [Appellant] and defendant Weakley conducted cross-examination of Mr. Culp. Both lawyers posed numerous questions regarding Mr. Culp's direct testimony.

We have examined Mr. Culp's testimony within the analytical framework set forth in Judge Muroski's previously discussed opinions and conclude this testimony is admissible at trial.

Mr. Culp's testimony was given under oath and subject to, in our judgment, meaningful cross-examination. Although some objections interposed by the Commonwealth were sustained by the district judge, defense counsel was not significantly limited in the scope or nature of the cross-examination during Mr. Culp's testimony. It is also apparent, based upon this Court's present understanding of the Commonwealth's case, that Mr. Culp's testimony is of significant importance. Although this testimony is important it is certainly not the sole source of incriminating evidence against [Appellant]. It should also be noted that Mr. Culp has no history of crimen falsi offenses; pending criminal charges or any agreement regarding pending criminal charges.

Although not essential to our determination, we are satisfied that the Commonwealth established through Detective Capitano's testimony, that [Appellant's] then counsel, Attorney Pike, was in possession of reports of interviews with Mr. Culp during the preliminary hearing conducted on June 14, 2006.

We have examined the admitted exhibits, including the April 27, 2010 report prepared by Detective Capitano, and discern no vital impeachment evidence as that term is understood in our jurisprudence.[9]

[9] The term "vital" impeachment evidence is discussed at page 12 of Judge Muroski's July 21, 2010 opinion and we have employed that definition presently.

Trial Court Memorandum, 1/5/15, at 2–4 (footnotes omitted).[6]

Our review of the record confirms that Appellant was represented by counsel at the 2006 preliminary hearing and that no essential, critical, and indispensable information related to Mr. Culp existed. N.T., 6/14/06, at 2. Thus, we conclude that counsel had a full and fair opportunity to cross-examine Mr. Culp. Consequently, Appellant is not entitled to relief on this issue.

Next, Appellant challenges the expert testimony of the Commonwealth's forensic pathologist, Dr. Michael Baden, who conducted the autopsies on the victims. Appellant's Brief at 53. Appellant argues that Dr. Baden's expert medical opinion regarding evidence of blunt force trauma consistent with the use of a rolling pin on Michael Kerkowski, Jr.'s body was improperly based on hearsay facts supplied by Mr. Weakley. *Id.* at 54. According to Appellant, "[H]earsay statements of cooperating co-conspirators is not the type of evidence customarily relied upon by forensic

_____

[6] Judge Muroski wrote, "This term connotes essential, critical, and indispensable information." Certified Record Docket Entry 198 (Judge Muroski Order and Memorandum, 7/21/10, at 12).

pathologists in rendering a medical opinion." *Id.* at 55. Additionally, Appellant argues that Dr. Baden's testimony caused prejudice in that it bolstered Mr. Weakley's testimony. *Id.*

In response, the Commonwealth relies on Pennsylvania Rule of Evidence ("Pa.R.E.") 703. Commonwealth's Brief at 24. Pa.R.E. 703 provides: "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." According to the Commonwealth, Dr. Baden personally observed the bruising on Michael Kerkowski, Jr.'s body, opined to a reasonable degree of medical certainty that such injuries were caused by blunt force trauma, and indicated that such trauma was consistent with blows from a rolling pin; therefore, his testimony was properly admitted. Commonwealth's Brief at 24.

Upon review of the appellate briefs, the certified record, and the applicable law, we conclude that Appellant's fifth issue does not warrant relief. Contrary to Appellant's assertion, Dr. Baden's expert testimony was not based on hearsay facts but on his personal observations and the record testimony of Mr. Weakley. Moreover, Dr. Baden testified to a reasonable degree of medical certainty. In support of our conclusion, we adopt as our own the thorough and well-reasoned analysis of the trial court. Trial Court Opinion, 9/24/15, at 45–53.

In his sixth issue, Appellant complains that the trial court erred in denying his motion for a mistrial. Appellant's Brief at 56. The genesis for

this claim was the Commonwealth's effort "to elicit testimony from [Appellant's] then-girlfriend and key prosecution witness, Christina Strom, regarding an incident when [Appellant] purportedly went to a police station in January 2003 to discuss a robbery." *Id.* at 56–57. Appellant recounts that, despite defense objections—which the trial court sustained—and curative instructions, Ms. Strom testified about the robbery of Michael Kerkowski, Jr., suggesting that Appellant was involved in it with Mr. Weakley. Because Appellant was on trial for robbery, he concludes, "[t]he effect of this entire sequence of testimony was highly prejudicial and denied [Appellant] of a fair trial. A mistrial was the only recourse." *Id.* at 59.

The Commonwealth first responds that Appellant's statements to Ms. Strom about a robbery were admissible as voluntary extrajudicial statements. Commonwealth's Brief at 25 (citing ***Commonwealth v. Simmons***, 662 A.2d 621 (Pa. 1995)). Additionally, the Commonwealth contends that the trial court's curative instructions—to which defense counsel did not object—"cured any defect and a mistrial was therefore unwarranted." *Id.* Lastly, the Commonwealth suggests, "in light of the seven (7) weeks of testimony, it is impossible for the jury to reasonably infer the meaning of this scrap of testimony." *Id.* at 27.

We review the denial of a motion for mistrial according to the following standards:

> In criminal trials, declaration of a mistrial serves to
> eliminate the negative effect wrought upon a defendant when

prejudicial elements are injected into the case or otherwise discovered at trial. By nullifying the tainted process of the former trial and allowing a new trial to convene, declaration of a mistrial serves not only the defendant's interest but, equally important, the public's interest in fair trials designed to end in just judgments. Accordingly, the trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, . . . assess the degree of any resulting prejudice. Our review of the resulting order is constrained to determining whether the court abused its discretion. Judicial discretion requires action in conformity with the law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason.

*Commonwealth v. Jaynes*, 135 A.3d 606, 614–615 (Pa. Super. 2016) (quoting *Commonwealth v. Lettau*, 955 A.2d 360, 363 (Pa. Super. 2008) (citations and quotation marks omitted)). A mistrial "is not necessary where cautionary instructions are adequate to overcome prejudice." *Commonwealth v. Chamberlain*, 30 A.3d 381, 422 (Pa. 2011). Additionally, it is well settled that the jury is presumed to follow the trial court's instructions. *Commonwealth v. Travaglia*, 28 A.3d 868, 882 (Pa. 2011).

Upon review of the appellate briefs, the certified record, and the applicable law, we conclude that Appellant's sixth issue does not warrant relief. Ms. Strom's testimony referred to Appellant's statements. Even if the jury could infer that Appellant was implicating himself in a robbery, the trial court advised the jury to disregard the testimony. We presume the jury

followed the trial court's instructions, and Appellant does not otherwise attempt to offer any evidence establishing that the jury failed to do so in the instant case. *Travaglia*, 28 A.3d at 882. In support of our conclusion, we adopt as our own the thorough and well-reasoned analysis of the trial court. Trial Court Opinion, 9/24/15, at 53–57.

In Appellant's final issue, he complains that the trial court erred in permitting the Honorable Brendan Vanston to testify. Appellant's Brief at 60. Judge Vanston presided over Michael Kerkowski, Jr.'s drug distribution trial and subsequent plea proceedings in Wyoming County. Judge Vanston testified to noticing (1) Appellant was in the courtroom during Michael Kerkowski, Jr.'s guilty plea, (2) Appellant "glared" at Judge Vanston, which caused him "some concern," and (3) Appellant and Michael Kerkowski, Jr. left the courthouse and behaved in a manner he found "unusual." *Id.* at 61. According to Appellant, Judge Vanston's testimony served "no legitimate purpose" other than to "throw the weight of the judge's position, authority and weight of his judicial office on the Commonwealth's side of the scales." *Id.* at 62, 63–64 (citing **Commonwealth v. Connelly**, 269 A.2d 390 (Pa. Super. 1970)).

Initially, the Commonwealth criticizes Appellant's reliance on **Connelly**:

> Defense submitted two sentences dissected from the [**Connelly**] opinion without context. The case actually involves a judge who presided over [the] defendant's prior conviction. That judge was called to the witness stand in [the] defendant's trial on

subsequent charges under the guise of identifying that defendant as the same person who had entered a plea of guilty before him to the indictment.

Commonwealth's Brief at 28 (internal citations omitted). It then defends Judge Vanston testifying as a fact witness:

He was the only witness who observed the unusual celebratory behavior of [Appellant] and his victim following the victim having been found guilty of four or five offenses at trial and then later pleading guilty to another four or five offenses. He was the only person in the courtroom besides [Appellant], Mr. Kerkowski, obviously deceased at the time of the trial at bar and Mr. Kerkowski's counsel.

*Id.* at 29 (internal citations omitted). Lastly, the Commonwealth explains the connection between the victim's proceedings before Judge Vanston and (a) the defense theory that the money Appellant received from Michael Kerkowski, Sr. "was payment for legal services" and (b) Appellant's extortion of money from Michael Kerkowski, Jr.'s parents, "leaving them to believe that their son had fled after his guilty plea, but before his sentencing in Wyoming County, and [Appellant] was assisting him." *Id.* at 30 (internal citations omitted).

Generally:

relevant evidence, *i.e.*, evidence that logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact, is admissible. However, relevant evidence may be excluded if its probative value is outweighed by the likelihood of unfair prejudice. Admission of evidence rests within the sound discretion of the trial court, which must balance evidentiary value against the potential dangers of unfairly prejudicing the accused, inflaming the passions of the jury, or confusing the jury.

- 22 -

*Commonwealth v. Wilson*, ___ A.3d ___, 2016 PA Super 144, at \*5 (Pa. Super. 2016) (quoting *Commonwealth v. Jordan*, 65 A.3d 318, 324–325 (Pa. 2013) (internal citations, quotation marks, and brackets omitted)).  A trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.  *Id.* (citation omitted).

Upon review of the appellate briefs, the certified record, and the applicable law, we conclude that Appellant's seventh issue does not warrant relief.  We discern no abuse of the trial court's discretion in permitting Judge Vanson to testify as a fact witness under the unique circumstances of this case.  In support of our conclusion, we adopt as our own the thorough and well-reasoned analysis of the trial court.  Trial Court Opinion, 9/24/15, at 60–67.

Because Appellant's issues are waived or lack merit, we conclude that he is not entitled to relief.  Therefore, we affirm the judgment of sentence for the murders of Michael Kerkowski, Jr. and Tammy Fassett.[7]

---

[7] The parties are directed to attach a copy of the trial court's September 24, 2015 opinion in the event of further proceedings in this matter.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/11/2016

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF COMMON PLEAS

V.

HUGO MARCUS SELENSKI,

Defendant

: OF LUZERNE COUTNY

-CRIMINAL-LAW

:

: NO: 2700 OF 2006

## OPINION

## PROCEDURAL HISTORY

On August 3, 2012, more than three years prior to the drafting of this opinion, we stated "To describe the procedural history in the instant matter as unique and protracted is indeed an understatement." On that date a memorandum was issued which addressed eighteen issues raised in defendant's supplemental omnibus motion.[1]

A criminal complaint charging the defendant with the murders of Michael J. Kerkowski and Tammy L. Fassett was filed on March 16, 2006. A criminal information was subsequently issued on July 27, 2006 setting forth ten offenses including two counts of criminal homicide; one count

[1] This memorandum consists of 64 pages. If one wishes to examine a detailed outline of the procedural history to that point it is set forth in pages 6 through 15 which discuss Pa.R. Crim. P. 600. Additional procedural history is extensively set forth by Honorable Chester B. Muroski in memoranda issued on May 17, 2007 and July, 21 2010 disposing of a multitude or pretrial issues.

alleging the defendant conspired to kill Mr. Kerkowski and Ms. Fassett with Paul Weakley; one count alleging the defendant solicited Rodney Samson to kill Mr. Kerkowski; two counts of robbery relating to Mr. Kerkowski and Ms. Fassett; two counts alleging the defendant conspired with Paul Weakley and did in fact commit the offense of robbery against Mr. Kerkowski and Ms. Fassett and finally, a single count of theft regarding Mr. Kerkowski. We also note the information referenced the Crimes Code section providing for accomplice liability.[2]

These offenses were alleged to have been committed between March, 2002 and May 31, 2002 at 647 Pritchard's Road, Hunlock Township, the residence of Mr. Kerkowski.

Subsequent to a jury trial commencing on January 21, 2015 and concluding on February 11, 2015 the defendant was found guilty of all counts except count five, solicitation of Rodney Samson to commit homicide and count nine, robbery of Ms. Fassett.

A penalty hearing was convened on February 17, 2015 and the following day the jury returned verdicts of life imprisonment. (Penalty Phase Transcript N.T. 343).

---

[2] The definition and liability of accomplice is set forth at 18 P.S.A.§306 (b)(3),(c),(b).

Formal sentencing was conducted on March 27, 2015. The trial judge determined the aforementioned life sentences would run consecutive to and not concurrent with one another. Additionally, the defendant was sentenced to an aggregate term of a minimum of 56 years to a maximum of 120 years consecutive to and not concurrent with the life sentences. During the sentencing proceeding an issue arose regarding the costs and expenses sought by the Commonwealth and a hearing was scheduled for and conducted on April 29, 2015 at which time the Commonwealth and defense stipulated to an amount of $140,000.00.

A notice of appeal was filed on May 21, 2015 and an order issued pursuant to Pa.R.A.P. 1925 (b) on May 22, 2015. On June 4, 2015 this court granted appellant's request for an extension of time within which to file a concise statement. A subsequent request by appellant was granted on June 25, 2015. Appellant's concise statement was thereafter received on July 17, 2015. The Commonwealth's request for an extension of time in which to respond was granted on August 10, 2015. The Commonwealth's response was received on August 14, 2015.

Additional procedural history and relevant dates will be referenced during discussion of the issues raised.

All appellate law and authority referenced in our subsequent analysis is discussed without specific quotation or further reference to the authority utilized unless otherwise noted.

## ISSUES PRESENTED

The following is a summary of the statement of errors complained of on appeal, submitted on July 17, 2015. We also note, appended to the concise statement as exhibit "A" is twenty-one pages of a sixty-three page transcript of the sentencing proceeding for Christina M. Strom which occurred on June 5, 2015 before the Honorable Thomas I. Vanaskie in the United States District Court for the Middle District of Pennsylvania.

1. The Defendant's right to counsel of choice, pursuant to the Sixth Amendment of the United States Constitution and Article I section 9 of the Pennsylvania Constitution, was violated and a new trial awarded because the trial court granted the Commonwealth's motion to disqualify Attorney Centini from her "long-standing representation" of the defendant for a purported conflict that he waived.

2. The Defendant's right to counsel of choice, pursuant to the Sixth Amendment of the United States Constitution and Article

4

I, section 9 of the Pennsylvania Constitution, was violated and the defendant awarded a new trial because the trial court granted the Commonwealth's motion to disqualify Attorney Centini when that motion was "baseless and unnecessary" and its "grounds were concocted" by the Commonwealth to create a conflict and deprive the defendant of chosen counsel.

3. A new trial should be awarded because the Commonwealth failed to disclose "material and vital impeachment evidence of a key witness" Tina Strom pursuant to Brady v. Maryland, 373 U.S. 83(1963) and Giglio v. United States, 405 U.S. 150(1972) and its progeny. Specifically, appellate counsel asserts, the Commonwealth failed to disclose an agreement to advocate for Ms. Strom at her federal sentencing hearing and that a motion to reduce her sentencing exposure based upon her cooperation had been filed in 2007.

4. A new trial is warranted because the trial court failed to provide an appropriate cautionary instruction after the introduction of alleged co-conspirator Paul Weakley's testimony that his guilty plea to both the current homicide and Goosay charges could not be used as any evidence against Mr. Selenski. The failure to

5

provide this instruction impermissibly infringed upon the defendant's right to a fair trial under the "United States and Pennsylvania Constitutions".

5. The trial court committed reversible error when it granted the Commonwealth's motion in limine to introduce the former testimony during trial of an unavailable witness, Ernest Culp, as it violated the defendant's right to confrontation under both the "Pennsylvania and United States Constitutions".

6. The trial court committed reversible error when it permitted the Commonwealth to elicit testimony regarding a firearm used in the "Goosay" case. The introduction of the alleged use of the gun "fell outside of the Superior Court's holding in Commonwealth v Selenski, 972 A.2d 1182(Pa. Super. 2009)."

7. The trial court committed reversible error when it permitted the Commonwealth's expert forensic pathologist, Dr. Michael Baden, to offer testimony regarding alleged blunt force trauma on the body of Michael Kerkowski (allegedly caused by a rolling pin), where the opinion was made eight years after the original autopsy and where this opinion originated in his expert

6

report of August 26, 2011, which was not rendered to a reasonable degree of medical certainty.

8. The trial court committed reversible error when it permitted Dr. Michael Baden to offer expert testimony regarding alleged blunt force trauma on the body of Michael Kerkowski that was based upon the hearsay facts supplied by prosecution witness Paul Weakley, where such statements are not the type reasonably relied on by experts in the same field.

9. The trial court committed reversible error when it denied a defense request for a mistrial after prosecution witness Tina Strom testified Hugo Selenski went to the police station in January 2003 to "talk about a robbery" after the Commonwealth was specifically admonished from introducing said testimony.

10. The trial court committed reversible error by failing to provide a consciousness of innocence instruction where the trial evidence supported such an instruction.

11. The trial court committed reversible error by permitting a common pleas judge, the Honorable Brendan J. Vanston, to

7

testify as a Commonwealth witness because such testimony was irrelevant and highly prejudicial as it gave the appearance of using the prestige of his office to advance the credibility and bolster the Commonwealth's case.

12. A new trial should be awarded because the Commonwealth failed to disclose its "tacit agreement" with a key witness Paul Weakley, which can reasonable be inferred by his conduct in reversing his refusal to testify at the eleventh hour.

The issues raised will be addressed seriatim and combined where appropriate based upon conceptual and substantive overlap.

## REMOVAL OF DEFENSE COUNSEL

On January 6, 2012 Shelley L. Centini, Esquire was appointed by the Court of Common Pleas as counsel for Hugo M. Selenski.[3]

---

[3] As can be readily discerned from a review of the previously referenced procedural history outlined in this court's memorandum of August 3, 2012 (pages 5 through 15), throughout the course of these proceedings this defendant has been represented by numerous lawyers, all at public expense, and this case has been presided over by five different Common Pleas Judges. It is also noteworthy that on June 29, 2011 the defendant submitted a pro se request to represent himself before then presiding Judge William Amesbury. On September 1, 2011 Judge Joseph Van Jura conducted a hearing after which Selenski's request to proceed pro se was granted. Thereafter, on November 8, 2011 the defendant presented a petition prepared by standby counsel David V. Lampman, Esquire to appoint "substitute counsel".

On July 19, 2013, a date of a scheduled pretrial conference in the instant matter, counsel requested to meet in camera. The transcript of this meeting reflects the presence of the following: District Attorney Stefanie Salavantis, Assistant District Attorneys Samuel Sanguledolce and Jarrett Ferentino, Defense Counsel E.J. Rymsza, Hugo Selenski, Detective Daniel Yursha, and Al Flora, Esquire who advised the court he was appearing as private counsel on behalf of defendant's co-counsel Shelley Centini, Esquire.

The matter initially discussed was a motion filed by the Commonwealth seeking reciprocal discovery of material allegedly in the possession of Attorney Centini.

Attorney Flora acknowledged he was present for a limited purpose, as private counsel for Attorney Centini. (July 19, 2013 N.T.8). Attorney Flora further related "...I have filed a Motion to Quash the subpoena relative to Attorney Centini's appearance before the state wide investigating grand jury on Tuesday". (Id. N.T.9).

The context of further discussion involved whether the Commonwealth's discovery request should remain sealed and therefore not public. The court concurred that the request would be sealed.

9

The trial judge next posed a question to first assistant district attorney Sangudolce regarding his "knowledge as to a grand jury investigation that has caused us to gather here in chambers". (Id. N.T. 14). The first assistant represented the following:

> As a result of information that was brought to the Commonwealth by the Commonwealth's witness—witnesses in this case and the observation of a potential conflict with the prosecution of this case and that information, the District Attotrney's Office referred that investigation to the Attorney General's Office.

> The salient points of that investigation were that the allegation that Miss Centini, who is Defense counsel's attorney, [sic], passed letters written by this Defendant, handwritten by this Defendant, to our witnesses which contained statements designed to intimidate the witnesses, have them change their testimony or withhold testimony. And there were further statements made about Miss Centini's and Mr. Sulima's involvement in that. Once that was referred to the Attorney General's Office, I had very little contact until I received a grand jury subpoena to attend and testify at a grand jury proceeding.

> I learned within the last few days that Miss Centini had also been subpoenaed. I have spoken to Mr. Flora, that he had been retained to represent her with respect to this grand jury investigation. As a result of that, we drafted the reciprocal discovery motion being that in addition to whatever the Attorney General is investigating, I believe the Commonwealth has a right to review those documents. They're evidence in this case as well. So, that's what brings us here today, Your Honor.

( Id. N.T. 15, 16).

10

Attorney Sangudolce further represented the Luzerne County District Attorney's Office initially referred the described investigation to the Pennsylvania Attorney General "many months ago". (Id. N.T. 16).

Attorney Rymsza acknowledged that co-counsel was "at a minimum" a potential witness before the grand jury, potentially a witness against Mr. Selenski and/or potentially a target in the grand jury investigation. Attorney Rymsza expressed an obvious concern, that given Attorney Centini's assumed unavailability "I cannot try this case alone." (Id.N.T. 17, 18).

Attorney Rymsza subsequently inquired whether, although Attorney Centini may have a conflict, "[I]t is my understanding that at this juncture, they are not asking for her to be removed from this case". The first assistant responded "At this point, we don't have enough knowledge to know if there is a conflict or not. It has been suggested by co-counsel, and I know the court maybe doesn't want to address this at this time, to appoint another lawyer in the event that this occurs, but- -"

( Id. N.T. 22). The trial judge interjected "[A]ny request along those lines would be premature. (Id.N.T. 22).

11

The pretrial conference was reconvened in the courtroom at which time the first assistant stated his awareness of a grand jury investigation being conducted by the Attorney General which "touches this case". (N.T. 2)

Attorney Rymsza requested a continuance, which was granted.

On January 27, 2014 the Commonwealth filed a "Motion of the Commonwealth to Remove Defense Counsel and Investigator and Appoint New Counsel and Investigator". A hearing on this motion was scheduled for and conducted on February 10, 2014. On that date the defendant was represented by Attorney Rymsza. Attorney Centini was not present, however, Attorney Flora who was, stated "I represent Attorney Centini on this matter". (February 10, 2014 N.T. 4).

The trial judge initially observed that attached and incorporated into the Commonwealth's motion was a copy of the "criminal charges filed by the Pennsylvania Attorney General following Grand Jury investigation against Attorney Shelley Centini; Investigator James Sulima; and Defendant herein, Hugo Selenski, which the Commonwealth contends relate directly to this criminal homicide trial for criminal acts

12

allegedly committed during the pendency of this homicide case". (Id. N.T. 2).

The trial judge further references paragraphs eight and nine of this motion, in which the Commonwealth represents its intent to use the information contained in the affidavits in their case in chief, as both direct evidence and evidence of Mr. Selenski's consciousness of guilt. Additionally, the trial judge referenced the Commonwealth's assertion that Attorney Centini and Mr. Sulima have now made themselves witnesses in the Commonwealth's case.

Attorney Rymsza represented Mr. Selenski was opposed to the disqualification of Attorney Centini. (Id. N.T.3).

Assistant district attorney Ferentino asserted that the facts and circumstances surrounding exchanges with five identified Commonwealth witnesses will be relevant to the Commonwealth's case in chief. Specifically, Attorney Ferentino, referencing the grand jury affidavit, argued potential Commonwealth witnesses were given letters by Attorney Centini, allegedly written by the defendant, and then returned to Attorney Centini. The prosecution further argued the charges filed by the Office of Attorney General on January 27, 2014 created an

13

"inescapable" conflict of interest. Mr. Ferentino further asserted that Attorney Centini's position with regard to the conflict should be placed of record, observing that as a co-defendant of Mr. Selenski Attorney Centini had a potential conflict of interest that goes to her "unfettered representation" of Mr. Selenski. (Id.N.T.9).

Mr. Ferentino also observed the referenced charges included a count of theft wherein the County of Luzerne was a victim. The alleged theft related to the payment of significant counsel fees to Attorney Centini during her representation in the capital prosecution against Selenski.

It should be noted that Attorney Centini did not appear during this hearing. In response to a question posed by the trial judge regarding whether Attorney Flora was present as private counsel to Attorney Centini, Mr. Flora responded "That is correct, Your Honor". (Id. N.T. 12).

Attorney Flora argued the court should deny the disqualification motion since the Commonwealth failed to meet its burden. In this regard Attorney Flora suggested "The presentment, really all that is, is a lot of conclusions. But what you don't have before you is the specific evidence

14

that they are looking to utilize and why they believe that Attorney Centini would be a necessary witness. And by a necessary witness, that no one else, no one else other than her can provide that information. That's what they haven't given you". (Id. N.T. 15).

Attorney Flora further argued that the defendant had a right to waive a potential conflict. (Id.N.T. 16, 20).

The trial judge thereafter stated "The goal of this court is to ensure fairness, a fair trial for all; for the defendant and for the Commonwealth". The court further noted reviewing and incorporating the affidavits attached to the previously referenced charges. The trial judge additionally observed that Attorney Centini is "certainly cloaked with the presumption of innocence", however, based upon the Commonwealth's representations, Attorney Centini would be called as a witness during its case in chief while at the same time serving as an advocate for a defendant in a capital case. The court further observed that defense counsel's alleged criminal acts related to her alleged conduct during her representation. The record reflects the conclusion that "Commonwealth witnesses called in this homicide case will likely inform the jury of counsel's alleged actions which could compromise legal representation and jeopardize a fair trial to Mr. Selenski in this homicide case. In that

15

event, the defendant could be denied conflict-free representation." (Id. N.T. 22). The trial judge determined the referenced scenario created a "serious conflict of interest".

Thereafter, the court inquired of the defense whether Mr. Selenski would seek to waive a conflict. The Commonwealth argued the conflict was "inescapable" and of such magnitude it could not be waived. (Id.N.T. 24).

The defendant indicated a willingness to waive the conflict and the court thereafter conducted a colloquy in this regard. (Id.N.T. 25 through 31).

At the conclusion of the purported waiver the trial judge stated "…I am very concerned for the sanctity, of the proceedings, and I want to protect the rights of all parties involved. I refuse to accept the waiver of conflict. Attorney Centini will be removed from this case. The court acknowledges that [Attorney Centini is] presumed innocent of the charges which have been filed against [her]." (Id. N.T. 31).

Parenthetically, we note Bernard J. Brown, Esquire was appointed to represent Mr. Selenski on April 17, 2014.

16

Appellate counsel presently argues that the court erred in granting the Commonwealth's motion to disqualify Attorney Centini in violation of the defendant's right to "chosen counsel" for what is described as a "purported conflict" that the defendant "waived".

It is further asserted the Commonwealth's disqualification was "baseless and unnecessary and its grounds were concocted by the Commonwealth to create a conflict and deprive Mr. Selenski of his counsel of choice".

In response the Commonwealth acknowledges that although a criminal defendant has an absolute right to counsel, he does not have an absolute right to counsel of his choice. The Commonwealth further observes that counsel in the instant matter was appointed utilizing public funds and an indigent defendant possesses no constitutional right to counsel of his choice.[4]

The Commonwealth also asserts, during the relevant time period, Attorney Centini was indicted for conspiring with Mr. Selenski to

---

[4] The Constitutional right to counsel is not absolute. Commonwealth v. Kelly, 5 A.3d 370 (Pa. Super. 2010). This opinion contains an excellent discussion outlining the parameters of the right to counsel generally and those of court appointed counsel at public expense. The trial court there determined that a criminal defendant unwilling to cooperate with three counsel, all of whom were assigned at public expense, forfeited his right to counsel.

17

intimidate witnesses in the form of paying one rent, as well as "engaging in acts to influence other witnesses to alter their prior statements to police".

The criminal complaints filed on January 27, 2014 by the Attorney General, as a result of an investigation conducted by the Thirty-Sixth Statewide Investigating Grand Jury, charged Attorney Centini, Mr. Sulima and Hugo Selenski with identical offenses. The affidavit summarizing the results of the investigation consists of thirteen pages.[5] To obtain a full understanding of the alleged conduct resulting in Attorney Centini's disqualification in the instant matter we commend any reader of this opinion to review the entire thirteen page affidavit. A succinct summary of the allegations is set forth on pages three and four:

> On January 6, 2012, the Luzerne County Court of Common Pleas appointed Centini to represent Selenski relating to charges that include criminal homicide and solicitation to commit criminal homicide. Despite her ethical obligations, the Grand Jury finds that Centini was actively engaged in unethical and criminal

---

[5] Attorney Centini was charged with two counts of intimidation of witnesses; conspiring with Hugo Selenski to intimidate witnesses; theft in excess of fifty thousand dollars for legal services performed during her representation of the defendant in the instant prosecution; conspiring with Hugo Selenski and James Sulima to commit theft ; conspiring with Hugo Selenski and James Sulima to commit perjury; solicitation of five prospective Commonwealth witnesses to commit perjury in the trial which is the subject of this appeal; obstruction; conspiring with Hugo Selenski and James Sulima to commit obstruction; tampering with or fabricating physical evidence by destroying the letter which was the subject of the grand jury investigation and conspiring with Hugo Selenski and James Sulima in the destruction of the aforementioned letter.

conduct throughout her representation of Selenski. Centini engaged in that conduct for improper purposes, including suborning perjury, obstructing or impairing the administration of justice, and intimidating witnesses. Centini met with at least five witnesses while continually blurring her role as Selsenski's advocate with interests potentially adverse to those of the witness. Centini met with witnesses and solicited information or statements from them while they were represented by counsel. Centini provided witnesses with letters from Selenski for the purpose of intimidation and directed the witnesses to commit perjury. On at least one occasion, Centini provided a witness with money and, on another occasion, expressed to a witness that Selenski was angry with the witness for prior statements to police. The Grand Jury finds that these letters were drafted by Selenski and presented by Centini and Sulima for the specific purpose of intimidation, soliciting perjury, and obstructing justice. Centini testified that these incriminating letters were simply "lost" following this meeting. The Grand Jury finds that the statements of Centini were not truthful and were made for the purpose of keeping this body from discovering the full facts of this matter. It is the finding of this Grand Jury that the letters were hidden or destroyed to avoid prosecution for the commission of criminal acts.

Centini's criminal conduct indicates that Centini's model of legal practice is synonymous with unethical and criminal conduct. Attorney Centini's actions indicate an absolute disregard for the rule of law and reflect a win-at-any-cost mentality unbecoming an officer of the court. In this manner, Centini's philosophy is consistent with the conduct and beliefs of her client, Selenski. Selenski possesses absolute contempt for the rule of law and seeks to escape justice. Selenski and Centini worked in concert to see the prosecution of Selenski undermined through whatever means necessary, including: conspiring to impede justice; intimidation of witnesses; solicitation of perjury; and obstruction or perversion of the administration of justice. Centini and Selenski's disdain for the administration of justice continued as they perjured themselves before the Grand Jury.

This Grand Jury rejects any assertion by Centini and her co-conspirator that this blatantly criminal and unethical conduct is justifiable as zealous defense work. The litigation of criminal matters occurs under the rule of law and within the rules which

19

govern any attorney's professional conduct. Any assertion that Centini's criminal conduct was merely the practice of law is rebutted by evidence that she abdicated her oath and became a co-conspirator in undermining the very laws she swore to uphold.

In considering the disqualification motion, and in preparation of this opinion, we have reviewed a law review article authored by Professor Ann Bowen Polin entitled "Conflicts of Interest in Criminal Cases: Should the Prosecution Have a Duty to Disclose ?". 47 Am. Crim.L.Rev. 1185 (Summer 2010). This extensively footnoted ninety-eight page discourse examines the issue of conflicts of interest arising from representation of defendants in criminal cases. A myriad of issues in this context are explored, however, we found particularly salient sections V entitled "Defense Counsel Facing or Under Investigation for Criminal Charges" and VI entitled "Raising the Conflict: The Prosecutor's Duty".

We find the following insights, rationale, sentiments and observations particularly poignant. They are summarized and set forth without specific quotation or reference other than already indicated.

Professor Bowen Polin suggests the existence of a serious conflict when defense counsel is fighting for her own interest against the hostile force of the criminal justice system, while, at the same time, representing

a defendant. An attorney accused of criminal conduct risks livelihood, reputation and potentially liberty.

If counsel is accused of criminal conduct by prosecution witnesses but is actually innocent, counsel may not be able to effectively closely examine the issue on cross-examination since counsel is placed in the role of witness for herself as well as advocate for the defendant.

The article recognizes when counsel is actually accused of criminal activity closely related to the defendant's alleged illegal conduct, a particularly intense conflict arises and the resultant harm to the defendant is likely to be so severe that counsel should not be permitted to represent the defendant. Indeed, if counsel is suspected of the same criminal conduct with which the defendant is charged, the impact on counsel's performance is likely to be pervasive and profound, given counsel's strong self-interest in avoiding criminal liability.

The following observation is particularly apropos to the matter sub judice:

In some instances, counsel's alleged wrong doing comes to light when the prosecution interviews its witnesses in preparation for the defendant's trial, and the witnesses inculpate counsel as well as the defendant. If a witness' likely testimony will inform the jury in the defendant's trial of counsel's illegal conduct, counsel's role in the case is compromised. That disclosure will prejudice the jury against counsel and, possibly, the defendant, thus undermining the fairness of the proceeding. The public's interest in the actual and apparent integrity of

21

the proceeding as well as the defendant's right to conflict-free representation come into play. In such a case, the court should be reluctant to permit counsel to continue in the case. (footnotes omitted).

The article strenuously suggests that early intervention in these types of cases is not only often feasible but will serve to best protect the defendant and the fairness of the process. If the prosecution discloses the existence of the investigation and requests the court to remove defendant's counsel from the case a trial court need not be concerned about the implications of public disclosure and may explore the nature and implications of the alleged conduct. Professor Bowen Polin suggests if an investigation is ongoing but not yet public disclosing that defense counsel is a target may compromise the investigation or potentially endanger witnesses. In this context the prosecution may protect the defendant as well as the government's interest by communicating with the trial court ex parte.[6]

In discussing raising a conflict of interest in the first instance the article indicates the primary burden rests on defense counsel to identify and address potential conflicts of interest, referencing authority contained

---

[6] A variation of which was pursued by the Attorney General during these proceedings. (See: July 19, 2013 N.T. 20).

22

in footnote 216. This authority includes the model rules of professional conduct, Rule 1.7.

In reviewing this article we have considered and been informed by three opinions issued by the United States Court of Appeals for the Eleventh, Third and Second Circuits.

In United States v. Hobson, 672 F.2d 825 ( 11th. Cir.1982) the court considered affidavits outlining testimony of two government witnesses which portrayed the defendant's attorney as having engaged in thoroughly improper and unethical conduct which, the court noted, would impugn severely the attorneys integrity and credibility in the eyes of the jury. Although the defendant indicated a willingness to waive any ethical issues in order to have the benefit of continued representation the Eleventh Circuit concluded "The defendant is not free to waive the problem presented here, however, because the ethical violation involves public perception of the lawyer and the legal system rather than some difficulty in the attorneys effective representation of [the defendant]. Id. F.2d at 829. The Eleventh Circuit thereafter affirmed the order of the district court disqualifying the defendant's attorney.

In Government of Virgin Islands v. Zepp, 748 F.2d 125 (3rd Cir.1984) the Third Circuit considered the Sixth Amendment guarantee

23

of the right to counsel's undivided loyalty. The appellant there contended that she was denied effective assistance of counsel because trial counsel had an actual conflict of interest due to his potential criminal liability for the same charges on which appellant was tried and the fact that he was a witness for the prosecution. In reversing Zepp's conviction the Third Circuit concluded that an actual conflict of interest existed which required withdrawal by trial counsel or disqualification by the court.

In arriving at this determination the opinion reviews decisional law holding that prejudice is presumed when counsel is burdened by an actual conflict of interest. In rejecting the governments position that no actual conflict existed because Zepp's trial attorney was never the subject of formal charges and faced no potential liability the opinion explains that trial counsel's interest and the defendant's interest diverged with respect to a material factual or legal issue or to a course of action in two respects. First, trial counsel could have been indicted for the same charges in which he represented the defendant and second, trial counsel was a witness for the prosecution. With regard to potential criminal liability of defense counsel the opinion instructs that when defense counsel has independent personal information regarding the facts underlying his

24

client's charges and faces potential liability for those charges, he or she has an actual conflict of interest. Id. F.2d at 136.

Finally, in United States v. Fulton, 5 F.3d 605 (2nd Cir. 1993) the Second Circuit explained and concluded that an actual conflict of interest exists when a defense attorney engages in wrongful conduct related to the charge for which his or her client is on trial. The court there considered allegations by a government witness that defense counsel had engaged in heroin trafficking which related to the charge for which the defendant was on trial. This, the opinion instructs, creates an actual conflict of interest and counsel's continued representation of a defendant in this context results in a per se violation of the Sixth Amendment.

Judge Walker, author of the opinion, further explains that while a defendant may generally waive his Sixth Amendment right to an unconflicted attorney, the essential aim of the Sixth Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer who he prefers, citing Wheat v. United States, 486 U.S. 153, 159 (1988).

The Fulton opinion further instructs when a lawyer's conflict, actual or potential, may result in inadequate representation of a defendant or jeopardize the court's institutional interest in the rendition of a just

25

verdict, a trial judge has discretion to disqualify an attorney or decline a proffer of waiver. Id. 5 F.3d at 612. The Court additionally observes where a government witness implicates defense counsel in a related crime, the resulting conflict so permeates the defense that no meaningful waiver can be obtained. In such a case, the court assumes that counsel's fear of, and desire to avoid, criminal charges or even the reputational damage from an unfounded but ostensibly plausible accusation, will affect virtually every aspect of his or her representation of the defendant. Id. 5 F.3d at 613.

It was certainly not this court's desire or inclination to simply remove Attorney Centini from her representation of the defendant in the instant matter. However, it was immediately apparent, given the extraordinary nature of the allegations, that serious consideration of her disqualification was required.

Indeed, the spectre of delay in this repeatedly delayed trial was troubling. The potential of yet another lawyer, in a line of lawyers, to represent this defendant would clearly portend additional delay and the expenditure of considerable resources.

Removal was, the obvious, necessary and only appropriate action based upon the aforementioned allegations. The alleged criminal conduct

of Attorney Centini was inextricably linked to her continued representation in this capital case. Moreover, the alleged conduct transformed her role as an advocate to a lawyer intent upon unethically shaping the course of a trial in an attempt to alter its outcome. A failure to remove defense counsel charged with this conduct would be, in our judgment, fundamentally unfair.

Counsel stood charged with attempting to change or alter the testimony of Commonwealth witnesses to secure an unwarranted advantage for her client, a defendant accused of capital crimes. The verdict in this and any trial should be the result of zealous advocacy, admissible evidence and applicable law and not that of a defense lawyer and investigator meeting, at their request, with Commonwealth witnesses at a bar during which they provide a "letter" from the defendant, which even the most feeble minded would recognize as intimidation or threat.

Defense counsel's alleged participation in this conduct is the antithesis of ethical and vigorous advocacy. It deprives the District Attorney and therefore the citizens of this Commonwealth of a fair and impartial trial and cannot be tolerated or condoned. Furthermore, there is absolutely no evidence in the record before this court which would permit a conclusion that the Commonwealth's motion to disqualify

27

Attorney Centini was "baseless and unnecessary" and simply "concocted" by the Commonwealth to create a conflict of interest. Absent from the record is any assertion, based upon testimony, evidence or representations by Attorney Centini herself that the alleged conduct was concocted or false or even that she wished to continue in her capacity as counsel for Mr. Selenski.

One should not confuse Ms. Centini's right against self incrimination with her obligation, both ethical and as appointed counsel utilizing public funds, to represent this accused capital murderer. Query how representation could be accomplished when Ms. Centini was not present. Moreover, counsel actually appeared "on her behalf" and specifically stated he was not representing Hugo Selenski. Can it be seriously argued this judicial rabbit hole scenario suggests the absence of a conflict.

Even a Sophist would not assert that a lawyer allegedly bent on corrupting a trial, yet alone one where a defendant stands accused of the most heinous of crimes, should remain in that capacity because the defendant, her alleged co-conspirator, wants her to do so.

Simply stated, defense counsel's removal from this case was precipitated by her alleged conduct and that of her client, Hugo Selenski.

28

## IMPEACHMENT

Appellate counsel next asserts the Commonwealth failed to disclose "material and vital impeachment evidence" of a key Commonwealth witness, Christina Strom. Specifically, it is argued the Commonwealth failed to disclose that it had agreed to advocate for Ms. Strom at her federal sentencing hearing and that a motion to reduce her sentencing exposure, based upon her cooperation, had been previously been filed in 2007. In support of this argument counsel attaches the previously referenced excerpt from Ms. Strom's hearing before Judge Vanaskie.

The Commonwealth responds that the charges pursued against Ms. Strom were brought by the United States Attorney and that the Commonwealth's efforts on her behalf "consisted of relating her cooperation to the federal judge presiding over her case which was indeed related to the defense".

The Commonwealth further asserts that Ms. Strom's indictment, guilty plea agreement and proffer letter were placed of record as exhibit 76, 77 and 113 respectively. The Commonwealth additionally asserts the

trial transcript in the instant matter reflects that Ms. Strom's proffer requires her to testify at trial and cooperate with the government.

Christina Strom's testimony appears in the trial transcript at pages 707 through 952. Initially, we shall review the law applicable to the Commonwealth's obligation under Brady v. Maryland, 83 S.Ct. 1194 (1963) and its progeny regarding evidence of an impeaching nature.

In Commonwealth v. Chmiel, 30 A.3d 1111(Pa. 2011) the Supreme Court examined precedent considering the due process requirement that a jury be informed of any promise or understanding that the government would extend leniency in exchange for a witness's testimony. Chmiel explains that the understanding between the prosecution and its testifying witness need not be in the form of a signed contract or completed ironclad agreement in order to qualify as Brady material. Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness.
Id. 30 A.3d at 1131.

We will review Ms. Strom's testimony as it relates to the issue raised.

During direct examination the first assistant district attorney asked Ms. Strom whether she "ended up with some federal charges." In response the witness indicated she was charged with perjury, for lying at a grand jury hearing and also for money laundering. ( Trial Transcript N.T. 713). In further explaining the nature of the charges Ms. Strom stated she lied about "where the money came from." She indicated she advised the grand jury that the sums about which she was questioned were saved rather than coming from the defendant Hugo Selenski. (Id. N.T. 713 through 715).

The prosecutor showed the witness Commonwealth's exhibit # 76, which was identified as the money laundering offense contained in the federal indictment.

The witness further identified Commonwealth's exhibit # 77 as a copy of the plea agreement in the federal prosecution. Ms. Strom affirmed that the referenced plea agreement required her truthful testimony in the state proceeding for the murders of Mr. Kerkowski and Ms. Fassett. The witness specifically stated that the plea agreement mandated "cooperation with the government". (Id. N.T. 716).

31

The prosecutor additionally questioned the witness regarding Commonwealth's exhibit # 113 which was referenced as a "proffer letter".

Ms. Strom next acknowledged she had not been sentenced with regard to the federal charges and in explaining "Why not?" she responded "I have to cooperate and testify at all the hearings. (Id. N.T. 717).

During cross-examination Ms. Strom was asked about her testimony before the grand jury. She was specifically questioned about Commonwealth's exhibit # 76 and further acknowledged that although she took an oath to tell the truth before the grand jury she, in fact, did not, resulting in the perjury charge. (Id. N.T. 842, 843).

Defense counsel posed additional questions regarding the fact that Ms. Strom had not yet been sentenced in federal court and that she was present testifying on behalf of the Commonwealth. (Id.N.T. 843).

During subsequent cross-examination this witness further acknowledged lying to the grand jury regarding money kept in a wine jar.(Id. N.T. 894).

Defense counsel returned to the theme of lying under oath at page 911 of the transcript and posed the question whether it was true that as part of her plea agreement Ms. Strom had to cooperate and testify in the

32

trial of Hugo Selenski. The witness acknowledged the agreement required her to cooperate and testify "no matter what". (Id.N.T. 911). Ms. Strom further acknowledged that is to her benefit. Defense counsel specifically asked "And isn't it true that you will get consideration for testimony—for your testimony?" to which the witness responded "Yes". (Id.N.T. 912). The previous question was followed up with a question regarding whether Ms. Strom would receive "substantial assistance" for her cooperation resulting in a reduced sentence to which she responded "Yes, I assume". (Id. N.T. 912).

After additional cross-examination defense counsel again asked the witness whether her plea agreement requires that she cooperate with the Commonwealth and testify against the defendant in the instant matter to which she responded "Yes, it is". (Id. N.T. 920).

At the conclusion of cross-examination the witness was asked, over the course of the last thirteen years how many times have you met with law enforcement or police officers to which she responded "I don't have an exact amount. The trial was supposed to happen many, many times, and I've been in with them. I couldn't honestly say an answer, but I've been with them quite often". (Id. N.T. 932). As a follow up defense

counsel reiterated that this was part of her plea agreement to which Ms. Strom responded "It's part of my plea agreement, yes". (Id. N.T. 932).

We have reviewed the portion of Ms. Strom's sentencing transcript, previously referenced in this opinion, within the framework of the Commonwealth's obligation to provide impeachment evidence and discern no Brady violation.

The transcript, in relevant part, contains testimony elicited by Assistant United States Attorney William Spencer Houser from Luzerne County Assistant District Attorney Jarrett Ferentino which outlines the nature and extent of Ms. Strom's participation and cooperation in the prosecution of Hugo Selenski. The AUSA's questions were supplemented by those posed by counsel for Ms. Strom, Joseph A. O'Brien, Esquire.

At various points during the proceeding Attorney Ferentino described Ms. Strom's testimony as "vital", "extremely significant" and "compelling".

In response to a question by defense counsel Attorney Ferentino stated he found everything Ms. Strom related to the state prosecutors to be "credible" and "documented evidence".

34

At pages 14 and 15 of the sentencing transcript Attorney Ferentino indicates, in part, "And I had assured her and Sam Sangudolce had assured her that we would sit here and note her participation and explain to you, Your Honor, just how significant her testimony was and who she was for our case". Attorney Ferentino further related "I wouldn't be here if Tina Strom did not do what she promised us to do and in a fashion that helped us secure a conviction against Hugo Selenski".

In order to establish a <u>Brady</u> violation, the defendant has the burden of demonstrating that (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant. Prejudice is demonstrated where the evidence suppressed is material to guilt or innocence. Further, favorable evidence is material, and constitutional error results from it's suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. <u>Commonwealth v. Koehler</u>, 36 A.3d 121, 133 (Pa. 2012)(Citations omitted).

When the testimony of Attorney Ferentino during Tina Strom's sentencing proceeding is juxtaposed with the cited portions of trial transcript and applicable law it does not suggest or require the conclusion that the Commonwealth withheld or suppressed impeaching evidence.

## PAUL WEAKLEY; CAUTIONARY INSTRUCTION

Appellant asserts a new trial is warranted because the court failed to provide an appropriate cautionary instruction after the testimony of Paul Weakley, an alleged co-conspirator of Selenski, that Weakley's guilty plea to the homicide charges involving Mr. Kerkowski and Ms. Fassett, as well as the Goosay charges, could not be used as evidence against Mr. Selenski.

During the course of an in chambers meeting to consider an offer of proof regarding Paul Weakley defense counsel stated "I think at some point, there's going to need to be some sort of, umm cautionary instruction provided that, umm, the fact that Mr. Weakley has plead guilty cannot in any way be inferred as guilt towards Mr. Selenski". (Id. N.T. 994). Thereafter, prior to the conclusion of Mr. Weakley's testimony the trial judge advised all counsel that he would give a cautionary charge concerning how Mr. Weakley and Mr. Selenski allegedly met while incarcerated. Parenthetically, it should be noted

36

that this issue was previously discussed and ruled upon. Additionally, the trial judge indicated he would give a cautionary charge regarding the "Goosay incident" in accordance with Superior Court's opinion permitting the introduction of the robbery there committed.[7] Defense counsel again requested what was termed a "limiting instruction" regarding Mr. Weakley's guilty plea to the murders and Goosay robbery. After a brief discussion concerning the two previously mentioned cautionary instructions the record reflects Attorney Rymsza stating "what about my other--" to which the trial judge interjects "That will be given at the appropriate time. I will give it". Immediately thereafter the first assistant district attorney indicates he has no objection to the requested instruction. (Id. N.T. 1334, 1335).

Subsequently, during the charging conference the trial judge reiterated "Mr. Rymsza I referred to the guilt by association charge, which we discussed earlier. That will be given as presented by you". (Id. N.T. 2700). On the very next page of the transcript the judge again states he will charge the jury regarding guilt by association requested by Attorney Rymsza. An examination of the jury instructions reveals the court did just that.

---

[7] These instructions were subsequently given and are reflected at pages 1346, 1347 and 1348 of the trial transcript.

Jurors, you have heard testimony regarding Paul Weakley's guilty plea in connection with the murders of Michael Kerkowski and Tammy Fassett. I am specifically instructing you that Mr. Weakley's guilty plea cannot be considered as evidence against Mr. Selenski. Mr. Selenski has a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to the criminal prosecution of Mr. Weakley. You are prohibited from inferring guilt by association. You may only consider Mr. Weakley's testimony pursuant to the rules I have and will give you through the conclusion of my charge.

(N.T. 2820).

Appellant's asserted error is belied by an examination of the record.

## ERNEST CULP

Appellant argues the trial court committed reversible error in permitting the Commonwealth to introduce the preliminary hearing testimony at trial of Ernest Culp, an unavailable witness, in violation of the defendant's right to confrontation under both the "Pennsylvania and United States Constitutions".

On January 5, 2015, in response to the Commonwealth's motion in limine, this court issued an order and memorandum permitting the Commonwealth to utilize the preliminary hearing testimony of Ernest (Ernie) Culp. This memorandum is appended hereto as court's attachment #1 and incorporated by reference. Although clearly set forth

38

in the memorandum, we direct the readers attention to footnotes 4 and 5.
These footnotes reference prior opinions issued in this case on May 17,
2007 and July 21, 2010 by then presiding Judge Chester B. Muroski.
These opinions, at the pages designated in the aforementioned footnotes,
extensively discuss the analytical framework employed in this context.

## GOOSAY ROBBERY

Appellant's counsel argues the trial court committed reversible
error when it permitted the Commonwealth to elicit testimony regarding
a firearm used in what has become commonly referenced as the
"Goosay" case. It is suggested this ruling ran afoul of the majority panel
opinion issued by Superior Court on February 17, 2009. Commonwealth
v. Weakley, 972 A.2d 1182 (Pa. Super. 2009).[8] The relevant facts and
procedural posture there considered are set forth at pages 1185 through
1187 of the opinion. Superior Court quotes extensively from the trial
court opinion which summarized the circumstances of the Goosay
robbery. In pertinent part these circumstances include:

---

[8] Fitzgerald, J., filed a dissenting opinion. The cases against Weakley and Selenski were consolidated by Superior Court sua sponte as the Commonwealth appealed from the trial court's granting defendants' motions in limine to exclude "other crimes"evidence relating to the subsequent Goosay robbery.

- One of the men displayed a firearm and ordered Goosay to the floor.
- The man with the firearm remained behind while the other man left in Goosay's car.
- Weakley's DNA was found on one of the dishcloths located in the car, Goosay identified Weakley early on and, on August 27, 2003,
- Weakley admitted to the robbery and stated that Selenski was involved in and planned the robbery.
- Weakley indicated that Selenski held Goosay at gunpoint using a BB-type handgun while Weakley secured Goosay with handcuffs and put duct tape over his eyes and mouth.
- The sneaker print allegedly matches a sneaker of Selenski's found at Mt. Olivet Road, and a BB-type pistol found in a vehicle operated by Selenski during the June 2003 search of Mt. Olivet Road was consistent with the weapon described by Goosay.
- A black BB-type pistol was found in a vehicle operated by Selenski.

As indicated, the trial court initially excluded evidence from the Goosay robbery in the underlying homicide prosecutions of Mr. Kerkowski and Ms. Fassett. Superior Court observed that the essential thrust of the Commonwealth's argument on appeal is that the trial court erred in granting the defense motion in limine because **"evidence** of the Goosay robbery was admissible due to the great number of similarities between the crimes."(Emphasis supplied), (Id. at 1187).

Superior Court next identified the twelve purported similarities set forth by the Commonwealth at pages 1187 and 1188 of the opinion. For

40

our present purposes, without fully setting forth these similarities, we note none include a gun or weapon.

In reviewing the purported similarities, through the analytical lens of applicable law, Superior Court concluded that evidence of the Goosay robbery would be admissible at the subsequent murder trials. Interestingly, in conducting this analysis Superior Court observed:

> In comparing the methods and circumstances of separate crimes, a court must necessarily look for similarities in a number of factors, including:(1) the manner in which the crimes were committed; (2) **weapons used**;(3) ostensible purpose of the crime; (4) location; and (5) type of victims.

(Id. at 1189),(emphasis added).

Furthermore, in rejecting the argument that the other crimes evidence was more prejudicial than probative Superior Court commented:

> To be sure, the [Goosay robbery] involves an intense episode very much in the nature of the charged crime—as it must to have probative value. When viewed either on it's own facts or in the context of a charged crime alleging death by strangulation and multiple macabre burials, however, the "other crimes" evidence as to the methods of selecting, ambushing, restraining, and robbing a victim — who managed to survive in relatively good health — cannot be presumed to rouse the jury to overmastering hostility. (Id. at 1191).

During trial Samuel Goosay was called by the Commonwealth and testified regarding the facts and circumstances of the aforementioned

41

robbery. This testimony appears at pages 2307 through 2382 of the trial transcript.[9]

Mr. Goosay outlined for the jury what occurred on August 27, 2003 as he was sitting at his kitchen table eating dinner at approximately 6:00 p.m.. Two men burst through the door one of whom, subsequently identified as Hugo Selenski, had a gun which was pointed at Mr. Goosay as he was pushed to the floor and his life threatened. (N.T. 2311 through 2313). Mr. Goosay identified Commonwealth's exhibit #185 as the gun brandished and used by Mr. Selenski.

Mr. Goosay additionally described his ability to push previously applied duct tape off one eye and observe the gun on his bedroom dresser while Mr. Selenski was on his knees. Mr. Goosay stood up grabbed the gun and put it to Selenski's head after which a struggle ensued and Mr. Goosay was struck several times in the arms, face, legs and chest. (N.T.2329 through 2332). During the struggle Selenski was able to secure control of the gun.

Subsequently, Mr. Goosay related that the phone rang at his residence. Selenski placed the phone in a manner in which he could hear

---

[9] At the conclusion of Mr. Goosay's testimony the court gave an appropriate cautionary instruction regarding the jury's consideration of the events which occurred on January 27, 2003. (N.T. 2383, 2384).

42

what was being said. The alarm company was calling and advised Mr. Goosay that the alarm was going off at his jewelry store and that the police had been dispatched. At that point Selenski "...hit me in the back of the head with a gun- - that gun you showed me before and took off out the front door". (Id. N.T. 2338).

During the testimony of Paul Weakley the Commonwealth posed multiple questions concerning, and elicited information regarding, the Goosay robbery. (N.T. 1189 through 1212). At page 1197 of the transcript Attorney Rymsza interposes an objection regarding Weakley testifying about the gun used in the Goosay robbery indicating "The Superior Court Opinion didn't reference anything about the use of a gun". A discussion then ensues between the defense, commonwealth and the trial judge examining this issue, after which the court overruled the defense objection regarding mention of the gun. (N.T. 1198 through 1207).

Initially, we observe that the previously referenced Superior Court Opinion at no time identifies and discusses the admissibility or inadmissibility of specific evidence regarding the Goosay robbery. Rather, in the context of considering the admissibility of other crimes evidence, the court concludes that evidence of the robbery is admissible

43

because of the number of identified similarities in the offenses considered.

Evidence of the Goosay case could have indeed become what Judge Muroski described as "a mini - trial" within the murder prosecutions.[10]

Succinctly stated, the previously referenced testimony is evidence of the robbery committed by Selenski and Weakley against Mr. Goosay. It may also be considered an additional similarity between the two offenses. An additional similarity cannot make the Superior Court's holding less compelling. Indeed, just the opposite, a gun possessed and used by Selenski during the course of the Goosay robbery makes the rationale and holding of the Superior Court more compelling.

The Superior Court was unequivocally aware that a gun was used during the Goosay robbery, given its aforementioned references to Judge Muroski's trial court opinion.

We can discern no reason to prohibit testimony regarding the gun and Selenski's possession of it. This would require the Commonwealth to present an edited version of the robbery, "evidence" of which was deemed admissible by Superior Court, that would inaccurately portray

---

[10] Trial Ct. Op at 19-20; 972 A.2d at 1187.

44

events as they occurred. Selenski's conduct throughout the course of the Goosay robbery was deemed relevant and admissible. We found and reiterate, there is no legal or factual reason to remove from the jury's consideration a substantial portion of Selenski's conduct during the Goosay robbery. If this court sustained the objection interposed by defense counsel the jury would have been left with a stilted and substantially inaccurate picture of what occurred, a result which was unnecessary and unwarranted.[11]

## DR. MICHAEL BADEN

Appellant posits two allegations of "reversible error" regarding the testimony of Dr. Michael Baden, a forensic pathologist retained by the Commonwealth in this matter. Initially, counsel asserts Dr. Baden's expert testimony regarding alleged blunt force trauma on the body of Michael Kerkowski, caused by a rolling pin, was not rendered to a reasonable degree of medical certainty. Secondly, it is asserted Dr. Baden's expert testimony regarding the aforementioned blunt force trauma on the body of Michael Kerkowski was based upon hearsay facts "supplied by chief prosecution witness Paul Weakley, where such

---

[11] On May 7, 2014 we precluded the Commonwealth from referring to the actual verdict rendered in the Goosay case by the Monroe County Jury. (May 7, 2014 Transcript N.T. 7 through 9).

45

statements are not the type reasonably relied upon by experts in the same field, in violation of Pa.R.E. 703".

An offer regarding Dr. Baden's testimony appears at pages 2039 through 2055 of the trial transcript. The Commonwealth related, in part, that Dr. Baden would discuss areas of blunt force trauma observed on the body of Michael Kerkowski, particularly above his right knee, and the back and top of his head which, it was asserted, corroborates the testimony of Paul Weakley. (Id. N.T. 2042). The prosecution further suggested this corroborates the testimony of Paul Weakley, " which Dr. Baden is familiar with Mr. Weakley's statement. It's referenced in his report. Umm, he's going to testify that the rolling pin that he's been shown could have caused the impacts that are in the - - the head and on the knees of Michael Kerkowski".

Defense counsel objected, arguing the expert's report does not express an opinion with a reasonable degree of professional certainty "so we would ask to preclude his testimony and the - - the report, itself". (Id. N.T. 2043). Counsel further objected to Dr. Baden "…using the statements of Paul Weakley in reliance of his opinion from April 19, 2010 in his memo, umm, in that it's based on hearsay. Umm, I realize Mr. Weakley's testified, but I still think, nevertheless, it's hearsay". (Id.

46

N.T. 2044). Defense counsel thereafter refers to what is described as the third report authored by Dr. Baden on October 26, 2011 which, it is represented, talks about hemorrhages on Mr. Kerkowski's body, that were consistent with having been caused by blows from a rolling pin. Counsel suggests that this opinion has not been made or rendered to a reasonable degree of professional certainty. (Id. N.T. 2045).

Defense counsel further objected to Dr. Baden's use of the phrase "consistent with". (Id. N.T. 2049).[12]

The argument regarding these issues goes back and forth at pages2043 through 2055 of the trial transcript, during which defense counsel acknowledges having three reports authored by Dr. Baden. The dates represented are June 8, 2003, April 19, 2010 and October 26, 2011.

Thereafter, at page 2128 of the trial transcript the trial judge denies the defense objections regarding Dr. Baden's testimony. The court references two opinions, Commonwealth v. Baez, 720 A.2d 711 (Pa. 1999) and Commonwealth v. Spell, 28 A.3d 1274(Pa. 2011), in support of its conclusion. Baez, in particular, instructs that an expert is not

---

[12] For Pennsylvania cases approving of the phrase "consistent with" in the context of expert testimony, see Commonwealth v. Ratsamy, 934 A.2d 1233, 1237 (Pa. 2007), Commonwealth v. Minerd, 753 A.2d 225(Pa. 2000).

47

required to use or employ any magic words, such as to or with a reasonable degree of medical certainty, when expressing an opinion. Rather a court will look to the substance of the actual testimony in examining its appropriateness.

Dr. Baden was called by the Commonwealth and initially outlined his extensive education, experience and expertise. (Id. N.T. 2139 through 2148). Dr. Baden has received board certification in anatomic, clinical and forensic pathology and was permitted to testify as an expert in these fields. (Id.N.T. 2147, 2148).

Dr. Baden was shown and identified Commonwealth's exhibits 232, 233, 234 and 236. They are respectively the autopsy report regarding Tammy Lynn Fassett of January 8, 2003; the autopsy report of Michael Kerkowski of June 8, 2003; correspondence dated April 19, 2010 directed to Det. Lt. R. Gary Capitano and correspondence dated October 26, 2011 directed to assistant district attorney Michael Melnick.

Dr. Baden subsequently testified, in great detail, about the cause and manner of death of both Mr. Kerkowski and Ms. Fassett, which included an explanation of the mechanics of the strangulation process.

48

At page 2214 of the transcript Dr. Baden, in response to a question posed by the Commonwealth, indicated he "reviewed a multi-paged statement of Mr. Weakley". Dr. Baden indicated the autopsy findings were consistent with the statement. (Id. N.T. 2215).

Thereafter, at page 2218, Dr. Baden reiterated that the statement he reviewed was consistent with the findings he expressed to the jury. The witness specifically stated the placement of multiple ligatures on Mr. Kerkowski was consistent with Mr. Weakley's statement.

Defense counsel requested a sidebar during which the Commonwealth outlined additional questions it wished to pose regarding Mr. Weakley's testimony concerning his observation of Mr. Kerkowski's face turning blue. Argument regarding this issue appears at pages 2221 through 2223 of the trial transcript, at the conclusion of which the trial court precluded any additional reference to Mr. Weakley's statement. (Id. N.T. 2223).

Dr. Baden was subsequently questioned regarding what was identified as a kitchen roller (Commonwealth exhibit #53) and expressed an opinion that this was the type of instrument which could cause the

blunt force injuries about which Dr. Baden was previously questioned. (Id. N.T. 2233, 2234).

At the conclusion of direct testimony Dr. Baden stated that all of the opinions expressed were given to a reasonable degree of medical certainty in the field of forensic pathology. (Id. N.T. 2236).

During cross-examination Dr. Baden was repeatedly questioned regarding the initial autopsy reports and the subsequent correspondence which discussed bruising as a result of blunt force trauma. (Id. N.T. 2250 through 2262). The witness acknowledged the initial autopsy reports contained no reference or discussion regarding the bruising or blunt force trauma.

Upon further cross-examination Dr. Baden was asked about a meeting which occurred on October 25, 2011 at his office in Manhattan. The witness indicated he was provided with a twenty page statement represented to be from Mr. Weakley. (Id. N.T. 2263). The statement was described as handwritten and the witness stated "I believe Mr. Weakley gave information to a person who wrote this down". (Id. N.T. 2266, 2267). No further questions were posed regarding the statement.

50

An examination of the transcript reflects that at no time was Dr. Baden asked to identify or recount any portion of the statement nor did he articulate the words purportedly contained in the statement during his testimony. More importantly, as reflected in the contextual summary, Paul Weakley testified during the course of this trial prior to Dr. Baden.

Initially, we observe that the opinion of a medical expert rendered to the requisite degree of certainty is itself evidence. Commonwealth v. Martin, 101 A.3d 706, 729 (Pa. 2014).[13]

It cannot be overemphasized that Dr. Baden was not permitted to act as a conduit to relate inadmissible hearsay information. As indicated, no specific statements reviewed by Dr. Baden and attributed to Paul Weakley were communicated to the jury. That Dr. Baden's opinions regarding pre-death blunt force trauma inflicted by an object consistent with the aforementioned rolling pin, corroborated the testimony of Mr. Weakley in significant respects, does not establish error.[14]

---

[13] For a discussion regarding the scope of an expert report in criminal cases where the court considered expressed opinions not included or different from those contained in the report ; See Commonwealth v. Roles, 116 A.3d 122 (Pa. Super. 2015); Commonwealth v. Stith, 644 A.2d 193 (Pa. Super. 1994).

[14] We concur with the court's observations in Galloway v. Mississippi, 122 So. 3d 614 (Miss. 2013) that a forensic pathologist may testify as to what produced a victim's injuries and what trauma such an injury would produce. A forensic pathologist may also testify about wounds, suffering, and the

51

That Dr. Baden was provided a statement from Mr. Weakley, which he reviewed, is similarly not problematic given both his acknowledgement of same and more importantly Weakley's testimony under oath during trial.[15] We reiterate, Dr. Baden did not act as a conduit from which flowed hearsay testimony of a non testifying witness. The Commonwealth simply did not employ Dr. Baden as a vehicle to introduce the testimony of Mr. Weakley as substantive evidence of the defendant's guilt. Any suggestion to the contrary is belied by the record.

No authority with which this court is aware would preclude the Commonwealth from contacting a forensic pathologist, after the performance of an autopsy and the issuance of a report, to pose additional questions regarding what the prosecution deems relevant and necessary in preparing its case.[16] These contacts and inquiries were not only acknowledged by the witness but Dr. Baden's written opinions in this

---

means of infliction of an injury since it falls within his area of expertise. Furthermore, a forensic pathologist may testify as to whether a particular instrument or weapon in evidence was consistent with particular injuries to a victim.

[15] The Pennsylvania Supreme Court has long held that expert opinion testimony is proper if the facts upon which it is based are of record. Commonwealth v. Rounds, 542 A.2d 977 (Pa. 1988).

[16] Indeed, one may question the fundamental competence of a prosecutor who did not do so.

regard were provided to the defense well in advance of trial. Indeed, defense counsel does not suggest otherwise.[17]

## MISTRIAL REQUEST

Here appellant states the trial court committed reversible error in denying a defense request for mistrial after "key prosecution witness Tina Strom testified that Mr. Selenski went to the police station in January 2003 to "talk about a robbery" after the Commonwealth was specifically "admonished from introducing said testimony".

In response the Commonwealth asserts that the trial court, after denying the motion for mistrial, gave a cautionary instruction to the jury. Additionally, the Commonwealth argues the statement in question was an admission by the defendant to Ms. Strom.

During the testimony of Ms. Strom the first assistant requested a sidebar during which he advised the court of his intent to ask the witness about an incident in January of 2003 "where she observes the defendant doing cocaine and then, for some reason, wants to go speak with police. She tells him that she thinks that's a crazy idea, and he wants to go and

---

[17] It is significant to note that as a result of defense counsel's request, this court appointed and authorized the expenditure of public funds for the forensic pathologist identified by the defense to assist the defendant in any manner deemed appropriate.

talk about a robbery. He's acting high and very nervous. It's being offered in line with her previous testimony to show his behavior after he had done it and how its erratic." (N.T. 760). The court sustained an objection to the proposed testimony.

After a recess the Commonwealth continued with its questioning of Ms. Strom. Referencing January of 2003 the Commonwealth asked whether Ms. Strom went with the defendant to the Dallas Police Station to which the witness replied yes. Ms. Strom was asked how it came about that Mr. Selenski wanted her to accompany him to the Dallas Police Department and she responded "Umm, he just said, You want to go with me? I want to go to the Dallas Police Department and talk to the police". (Id. N. T.766).

Counsel then inquired "Did you ask him why?" and Ms. Strom replied "I asked him why, and he said he had information about a robbery". (Id. N.T. 766).

Defense counsel interposed an objection and requested a sidebar. The transcript reflects a lengthy discussion regarding the objection after which the court stated "A reference to robbery would be prejudicial in this context. I will sustain the objection as to robbery". (Id. N.T. 777).

54

A discussion continued about other aspects of Ms. Strom's testimony after which the court overruled an additional objection by the defense but reiterated the witness may not use the word robbery. (Id. N.T. 780).

After continued discussion defense counsel made a motion for a mistrial. (Id. N.T. 783). The trial judge denied the motion and indicated he would provide a cautionary instruction. (Id. N.T. 784).

Thereafter, the record reflects the following instruction given to the jury:

> You are to disregard the last response that was given from this witness. Do not allow it to be considered in any of your deliberations. Whenever I sustain an objection or order evidence stricken from the record, you must completely disregard that evidence when deciding this case, understood? The last response is stricken.

(Id. N.T. 786).

In Commonwealth v. Chamberlain, 30 A.3d 381, 422 (Pa. 2011) Justice Baer, author of the opinion, instructs it is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. In this regard, an abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality,

55

prejudice, bias or ill-will discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.[18]

Additionally, as the Superior Court observed in Commonwealth v. Padilla, 923 A.2d 1189, 1194-95(Pa. Super. 2007) a mere passing reference to prior criminal activity will not necessarily require reversal unless the record illustrates definitively that prejudice results. Prejudice results where the testimony conveys to the jury, either expressly or by reasonable implication, the fact of a distinct criminal offense. Padilla's holding was reiterated in Commonwealth v. Hudson, 955 A.2d 1031(Pa. Super. 2008) where the court observed that the mere passing reference to prior criminal activity is insufficient to establish improper prejudice by itself. Furthermore, the trial court may cure the improper prejudice with an appropriate cautionary instruction to the jury. The instruction must be clear and specific, and must instruct the jury to disregard the improper evidence.

---

[18] See also, Commonwealth v. Johnson, 107 A.3d 52, 77 (Pa. 2014).

56

After examining the transcript we conclude that the statement uttered by Ms. Strom purportedly made by Mr. Selenski about a robbery is both innocuous and vague. It does not directly or necessarily by inference suggest that Hugo Selenski is going to the Dallas Township Police Department to implicate himself in a robbery. It is also apparent these words were uttered by Mr. Selenski. It was the defendant who requested that Ms. Strom accompany him to the Dallas Township Police Department on the day in question.

Even assuming the reference could be construed as criminal activity on the part of Mr. Selenski the record reflects the response was immediately objected to and, subsequent to a sidebar conference, the court gave the above referenced cautionary instruction.

We conclude the defendant was not prejudiced by Ms. Strom's response and, assuming prejudice, the direct, concise and specific instruction given by the trial judge cured the prejudice.

## CONSCIOUSNESS OF INNOCENCE INSTRUCTION

Appellant's counsel argues the trial court committed reversible error by failing to provide a "consciousness of innocence instruction"

where the trial evidence supported such an instruction referencing the trial transcript at pages 2694 to 2699.

An examination of the transcript reflects the court conducting an in chambers charging conference during which defense counsel requested the aforementioned charge. The only evidence referenced by counsel was "...I believe that- - umm- - Mr. Selenski offered to help dig, umm, when they were executing the search warrant, as well as, I believe he voluntarily went to the police umm---I think it was Shickshinny...which tended to show that he cooperated with the police". (N.T. 2697). The trial judge thereafter denied the defense request. (Id. N.T. 2699).

In Commonwealth v. Thomas, 54 A.3d 332 (Pa. 2012) the Pennsylvania Supreme Court affirmed the first degree murder conviction and death sentence of Dante Thomas concluding, in part, that a requested consciousness of innocence instruction was not warranted.

The opinion reflects the appellant there argued the trial court erred by failing to give this instruction although appellant provided no legal authority or support for such a charge. Appellant argued it was a "corollary" to the consciousness of guilt instruction given by the court. As factual support for the appropriateness of the instruction the appellant

cited his post-arrest cooperation with the police including a statement he gave in custody in which he denied the killing.

The Thomas court reviewed decisions from other jurisdictions rejecting a similar instruction.[19] These jurisdictions include Connecticut, Massachusetts, California and Arizona. Our Court indicated it was persuaded by the reasoning of the decisions in our sister states, as well as our own Superior Court, and declined to hold that a consciousness of innocence jury instruction would have been proper in the matter there considered. The Court further indicated the matter is properly one of argument to the jury. (Id. at 343).

At footnote four, the Thomas opinion noted whether a consciousness of innocence instruction might ever be appropriate under the factual circumstances of a particular case is left to the sound discretion of the trial courts.

If indeed the instruction is ever appropriate, it was certainly not presently.

---

[19] The opinion referenced a decision by the Pennsylvania Superior Court in Commonwealth v. Hanford, 937 A.2d 1094, 1097-98(Pa. Super. 2007) where Superior Court determined the claim was meritless.

## HONORABLE BRENDAN J. VANSTON

Appellant's counsel asserts the trial court erred in permitting a sitting common pleas court judge to testify in the instant matter because the "testimony was irrelevant and highly prejudicial as it gave the appearance of using the prestige of his office to advance the credibility of and bolster the Commonwealth's case".

In response the Commonwealth observes appellant has failed to cite any authority for the proposition that a witness should be precluded from testifying simply because the witness is a judge. "This position is not supported by the Rules of Evidence or any presidential case in Pennsylvania". The Commonwealth additionally argues the testimony of Judge Vanston was "directly relevant" since he observed the defendant glaring at him throughout the proceeding which was the subject of his testimony and further observed "the unusual behavior of the defendant and the victim". In further explaining its position, the Commonwealth states during trial evidence was presented that Mr. Selenski extorted money from the parents of one of the victims, Mr. Kerkowski, "leaving them to believe their son had fled after his guilty plea, but before his sentencing in Wyoming County." The Commonwealth also asserts that a trial issue involved the defense claiming that the money Mr. Selenski was

receiving from Mr. Kerkowski was payment for legal services. "Judge Vanston observed defendant present with Mr. Kerkowski at the time of his guilty plea."

At the inception of Judge Vanston's appearance the record reflects the Commonwealth articulating an offer of proof. In response defense counsel stated " I don't have any issue with Judge Vanston coming in and testifying that he presided over Mr. Kerkowski's case. What I do have a problem with is him injecting his credibility into this." Counsel further stated "I think its prejudicial if he comes in and he starts discussing this- - stare or this look and what his perception is". (Id. N.T. 275, 276).

The trial judge overruled the objection indicating he would permit adequate cross examination and encouraged defense counsel to make any objections deemed appropriate during the course of Judge Vanston's testimony. (Id. N.T.277,279).

Judge Vanston assumed the stand and indicated he is currently a senior judge in the Commonwealth of Pennsylvania. In 1989 he was elected as and presided as the only judge in Wyoming and Sullivan County, subsequently retiring in January of 2010.

61

This witness indicated he knew Mr. Kerkowski as a result of a prosecution "in my courtroom on a number of charges back in 20011-2002". (Id. N.T. 284).

Judge Vanston thereafter identified Commonwealth's exhibit # 23- a photo of Michael Kerkowski.

This witness additionally identified Commonwealth's exhibit # 41- a photograph of Tammy Fassett.

Judge Vanston related Mr. Kerkowski was found guilty of five or six offenses during a jury trial in which he presided. He identified Commonwealth's exhibit # 26 as the verdict slip from that trial, dated February 28, 2002.

Judge Vanston also indicated Mr. Kerkowski had a number of other outstanding charges "and he ended up pleading guilty to more charges later on". (Id. N.T. 288).

Judge Vanston next identified Commonwealth exhibit # 4 as a photograph of a person observed in his courtroom on April 25, 2002. (Id N.T. 290). April 25th, the witness explained, was the date of Mr. Kerkowski's guilty plea to the remaining offenses and the individual in the photograph, Hugo Selenski, accompanied him to the courtroom. (Id. N.T. 291). Mr. Kerkowski's counsel was also present. The witness

62

further stated that Mr. Selenski was the only spectator present that morning.

When asked if he recalled anything particular, Judge Vanston responded:

> First of all, it started with the guilty plea. The gentleman seated at that bench - - and it was a fairly lengthy proceeding, probably lasted a half – hour - - stared at me the whole time in what I would call a glare. An that caused me some concern and subsequently took some of their actions about, but that's the first unusual thing that happened that day".

(Id. N.T. 293).

Judge Vanston reiterated that the described guilty plea occurred on April 25, 2002. Sentencing was initially set for May 8, 2002 but then continued until May 14, 2002.

During the guilty plea the judge instructed Mr. Kerkowski to report to adult probation and thereafter left the bench. As the judge entered his chambers and removed his robe to begin to work on other matters he observed Mr. Kerkowski and Mr. Selenski walk by from left to right.

Judge Vanston next testified about what he described as their very unusual behavior.

> Well, I saw, umm, the same two gentlemen I'd seen in court just a few minutes earlier walking from my left to right, and they

63

were slapping each other on the back, laughing and, at one point, gave each other, (indicating), high fives. [20]

(Id. N.T. 298).

Judge Vanston, utilizing photographs, described how he moved from one window to another to continue to watch the behavior of the two individuals on the sidewalk. He then walked into the next room to continue to watch the activity and continued his observations until the "two gentlemen went out of view". (Id. N.T. 301).

The witness identified Commonwealth's exhibit #28, a bench warrant issued for the arrest of Michael Kerkowski as a result of his failure to appear for sentencing on May 14, 2002. (Id. N.T. 305).

During cross-examination Judge Vanston explained that Mr. Kerkowski appeared in front of him as a result of "serious drug offenses" and that Mr. Kerkowski was "definitely going to state prison". (Id. N.T. 313). Judge Vanston further indicated that although Selenski glared at him during the entire guilty plea proceeding he did not feel intimidated. (Id. N.T. 316 through 320).

---

[20] Paul Weakley advised the jury that Hugo Selenski and Michael Kerkowski were not friends. Indeed, Mr. Weakley testified that Hugo Selenski "hated" Michael Kerkowski. Mr. Weakley further described the relationship between Selenski and Kerkowski as "financial". Weakley additionally stated that Hugo Selenski provided absolutely no legal services for Mr. Kerkowski. (Id. N.T. 1029 through 1031).

Initially, we observe appellant's allegation of error in this regard is legally inadequate. It fails to articulate or explain the basis for the conclusion that Judge Vanston's testimony was "irrelevant and highly prejudicial". [21]

In Commonwealth v. Flamer, 53 A.3d 82(Pa. Super. 2002) Superior Court reversed a trial court's determination that the evidence there considered was inadmissible as irrelevant. The opinion outlines the following principles relating to relevance.

The threshold inquiry with regard to the admission of evidence is whether the evidence is relevant. Unless otherwise prohibited by law, all relevant evidence is admissible; all irrelevant evidence is inadmissible (Pa. R.E. 402.) The Pennsylvania Rules of Evidence define relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence". Pa.R.E. 401(emphasis added). Evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. Pa.R.E. 403. "Evidence is not unfairly prejudicial simply because it is harmful to the defendant's

---

[21] Because all relevant Commonwealth evidence is meant to prejudice a defendant, exclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than legal propositions relevant to the case. Commonwealth v. Gonzalez, 112 A.3d 1232, 1238 n. 6 (Pa. Super. 2015).

case". Commonwealth v. Williams, 48 A.3d 1265, 1269 (Pa. Super. 2012); Commonwealth v. Page, 965 A.2d 1212, 1220 (Pa. Super. 2009). A trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand. *See also*, Commonwealth v. Antidormi, 84 A.3d 736, 749-50 (Pa. Super. 2014).

The term bolstering which counsel for the defendant employed in various instances throughout the trial transcript has a specific legal meaning. Justice Eakin , author of the court's opinion in Commonwealth v. Smith, 995 A.2d 1143 (Pa. 2010) instructs improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record.

Although it is not our obligation to do so we can conceive of no meritorious or persuasive argument requiring the conclusion that the summarized testimony of Judge Vanston is irrelevant. Indeed, the opposite is true. Judge Vanston observed the alleged killer, Hugo Selenski, accompanying Mr. Kerkowski, who was found guilty of and entered guilty pleas to serious drug offenses on April 25, 2002, just eight

66

days before Mr. Selenski allegedly murdered Mr. Kerkowski with a motive of financial gain.[22]

The jury was certainly free to conclude that this was part of an ongoing calculated and cunning plan by Selenski to ingratiate himself with Mr. Kerkowski knowing Mr. Kerkowski would be sent to prison and then not only kill Mr. Kerkowski for profit but thereafter lead Kerkowski's parents to believe he fled to avoid imprisonment and in turn extort them into providing "legal assistance" for their son, who was actually dead and buried behind Selenski's home.

## PAUL R. WEAKLEY

In the final allegation of error counsel for appellant asserts the Commonwealth failed to disclose what is described as "its tacit agreement with its key witness Paul Weakley, which can reasonably be inferred by his conduct in reversing his refusal to testify at the eleventh hour".

The Commonwealth responds that the allegation of error fails to set forth any term of the alleged "tacit" agreement with Mr. Weakley and further that Mr. Weakley explained the reasons for his deciding to testify

---

[22] Mr. Weakley described the defendant's long standing plan to interrogate, rob and murder Mr. Kerkowski at pages 1045 through 1050 of the trial transcript.

during trial and was questioned about agreements. "Mr. Weakley was cross-examined ad nauseam about his prior crimes and any benefit he received in exchange for his testimony" referencing the trial transcript at pages 1328 through 1330. The Commonwealth additionally asserts the defendant has failed to allege any benefit that was not disclosed, since one does not exist. "Defense makes merely a blind, conclusory allegation unsupported by the record. We submit that this allegation, being wholly unsupported, fails and a new trial is certainly not warranted therefrom".

By way of context we observe the following. On December 24, 2014 the Commonwealth submitted a motion in limine to admit certain prior statements of Paul Weakley, as well as a brief in support thereof. The defendant's brief in opposition was received on December 30, 2014. On January 2, 2015 the Commonwealth filed a supplemental brief which essentially asserted a new and different avenue for the admission of Mr. Weakley's statements. A hearing on the original motion, which had been scheduled for that day, was continued to January 5, 2015. Thereafter, on January 5, 2015 defense counsel submitted a reply brief.

At the inception of the January 5, 2015 hearing the first assistant district attorney represented that subsequent to a conversation with Mr. Weakley, that

68

morning, defense counsel were advised that the Commonwealth would be withdrawing the aforesaid motion. (January 5, 2015 N.T. 6). The trial judge inquired whether the defense wished to be heard and was advised "No, Your Honor".

Subsequent to a discussion of other issues, defense counsel, referencing the Commonwealth's motion which in turn referenced a recent letter from Mr. Weakley regarding his unwillingness to testify, requested the defense be furnished with same. After inquiry by the court the first assistant district Attorney represented that the aforementioned letter would be transmitted that day i.e. January 5, 2015. (Id. N.T. 11, 12 ).

Paul Weakley's trial testimony begins with an offer of proof at page 958 of the trial transcript and concludes at page 1343, after which the Commonwealth and the defense read a stipulation regarding Mr. Weakley to the jury. (Id. N. T. 1350).

We will examine Mr. Weakley's testimony in the context of the alleged error.

During the offer of proof defense counsel references previous court orders requiring the Commonwealth to disclose "any promises of leniency, immunity, any sort of benefits". Defense counsel, citing the Commonwealth's aforementioned motion in limine, asserted "…because

69

they believed he was going to go south on them. I think, in light of that, we're entitled to know what changed his mind. I mean, I'm -- if there's any -- been any sort of benefit or any additional promises that have been made, I think we need to know it".

Defense counsel also requested the Commonwealth state of record that they provided all information regarding any benefit that Mr. Weakley may receive or is anticipated to receive. Defense Counsel acknowledges the federal plea agreement and what is described as a Rule 35 Motion and indicates "I think it's incumbent to know what may be -- what -- what the Commonwealth knows, what may have been discussed. I realize it's not their case, umm, but, certainly, they are part of the, (gestures air quotes), Prosecution team, they are privy to that information and, uh, in addition, they're still looming his, umm, his State Court murder case as well. Umm, I think we're entitled to know, in light of all that, just for the record, umm, what has been promised or what's expected". (Id. N.T. 969, 970).

The trial judge thereafter directs that the Commonwealth "disclose anything that you're aware of, representations or deals". The assistant district attorney responds to the court's question at pages 970 and 971 of the trial transcript after which the court observes that Mr. Weakley's trial

70

for the murders of Mr. Kerkowski and Ms. Fassett is scheduled for February.

The trial judge next posits the following inquiry:

> Now, since he since [Mr. Weakley] has returned from Arizona or whatever precipitated his return from Arizona, where there was an indication he was reluctant to testify in this case, have any additional promises or preferential treatment been afforded him?

The assistant district attorney responds :

> "No, Your Honor".

(Id. N.T. 971 ).

The first assistant district attorney additionally states:

> I can tell you, Your Honor, what happened when I found out that he wasn't going to testify - - in fact, what he said was that he didn't want to come to Luzerne County, that he was happy where he was, I immediately had him transported to Luzerne County, and in our meeting, we let him meet his lawyer. Obviously, we weren't privy to that discussion. I believe that his lawyer probably spelled out his deal and what his obligations were, and I think Mr. Weakley's statement was that the damage was done. He didn't want to leave Arizona. He was already here. So, we didn't promise anything. I've had no discussions, nor has any member of the Prosecution team would have had any discussions with the Federal Government about what he would get or any such thing. So, he is in the exact same status now as he was before I received that letter.

(Id. N.T.971, 972).

During his direct testimony Mr. Weakley is questioned regarding his current place of incarceration, the Federal Penitentiary in Tucson,

71

Arizona.[23] Mr. Weakley explains that he is serving a federal sentence of what is described as life plus ten years for the murders of Mr. Kerkowski and Ms. Fassett and for the offense involving Samuel Goosay's home in Tannersville. (Id. N.T. 1008).

Mr. Weakley identifies Commonwealth's exhibit # 128 as his federal plea agreement. (Id. N.T. 1012). He is asked and answers several questions by the Commonwealth regarding the terms and conditions of the plea which appear at pages 1015 through 1017 of the trial transcript.

The prosecutor further questions Mr. Weakley regarding additional charges that neither the Commonwealth of Pennsylvania nor the United States Attorney would pursue as part of his agreement to testify. These included robberies and what are described as "church burglaries". (Id.N.T. 1021). In this regard the witness acknowledges that several of the burglaries or robberies were not pursued by the Luzerne County District Attorney in exchange for the agreement entered into and further that he was required to acknowledge his role in the murders of Mr. Kerkowski and Ms. Fassett as well as the Goosay robbery. (Id. N.T. 1021).

---

[23] The city of Tuscon is misspelled whenever it appears in the trial transcript.

Concerning what are described as the "Kerkowski/Fassett murders" Mr. Weakley acknowledges that the charges remain outstanding in Luzerne County and that they will "eventually be dropped". (Id. N.T. 1022).

At the inception of cross-examination Mr. Weakley is extensively questioned regarding his numerous prior meetings with law enforcement and the multiple lies and inconsistent statements told over the course of these meetings. (Id. N.T. 1216 through 1242; 1251 through 1280).

During this questioning Mr. Weakley acknowledged he was absolutely looking for a benefit as a result of his cooperation.

This witness was further cross-examined about the charges filed against him for the Kerkowski and Fassett murders, on May 12, 2006. (Id. N.T. 1264).

Beginning at page 1281 of the trial transcript Mr. Weakley is questioned regarding his prior crimes. He is thereafter cross-examined regarding the aforementioned plea agreement in the federal prosecution. (Id. N.T. 1284, through 1286). Questioning in this context included the aforementioned church burglaries as well as "numerous burglaries in the winter of 2002/2003 that I committed that I wasn't prosecuted for under the terms of the agreement". (Id. N.T. 1286).

Counsel additionally questioned Mr. Weakley regarding what was described as an attempted escape from the Lackawanna County Prison in 2007 and child pornography charges. (Id. N.T. 1287).

During additional cross-examination Mr. Weakley acknowledged that he declined requests by the defense team to be interviewed in the instant matter. (Id. N.T. 1292).

Defense counsel questioned Mr. Weakley regarding a letter dated November 20, 2013 and identified as defendant's exhibit # 60 which he acknowledged writing, indicating he would not testify in this matter. (Id. N.T. 1322, 1323).

Mr. Weakley further acknowledged subsequently meeting with the District Attorney's Office and when questioned about what "the D.A. said to change your mind?", Mr. Weakley responded "The DA really didn't say anything, it was me coming around. I'm - - I was - - there's nothing in this for me. I'm not up here to get anything for testifying. And the repercussions I was receiving in prison for my role in testifying - - in this case were severe. I had been attacked and stabbed over 30 times". (Id. N.T. 1323).

Mr. Weakley acknowledged that during this meeting the prosecution reminded him of the "portions of your plea agreement that talk about cooperation and substantial assistance". (Id. N.T. 1326, 1327).

Mr. Weakley was next cross-examined regarding a second letter dated December 15, 2014, identified as defendant's exhibit # 61, referenced as "Greetings from Tucson". This letter informed the Luzerne County District Attorney that Mr. Weakley did not wish to testify. He was thereafter transported to Luzerne County.

During redirect examination Mr. Weakley was questioned regarding the two aforementioned letters and described his life in prison as an informant. He stated that he was "victimized" severely on numerous occasions indicating "You're considered one of the lowest members of prison society, and you're often victimized physically for - - for being labeled as an informant". (Id. N.T. 1342).

At the conclusion of Mr. Weakley's testimony a stipulation, identified as No. 12 entered into on February 10, 2006, was read to the jury by counsel for the defendant.

> The Commonwealth of Pennsylvania v. Hugo Selenski - - this will be Stipulation No. 12. On February 10, 2006, the DA - - Assistant - - the Luzerne County District Attorney's Office wrote a letter to Hugo Selenski's counsel, stating the Commonwealth is not charging Paul Weakley with offenses he admitted to committing in various interviews with law enforcement related to burglaries of

75

churches in the Back Mountain area; two, additionally, the Luzerne County District Attorney's Office entered into plea deals on the prosecution of Paul Weakley relating to the Hi-Tech Water burglary. Part of the non-prosecution agreement on the burglaries was that Paul Weakley was required to provide truthful testimony against Mr. Selenski. Previously, Paul Weakley has not provided truthful testimony; therefore, he could have been charged with those burglaries, if the Prosecution chose to do so, and as of this date, Paul Weakley has not been charged with those burglaries.

(Id. N.T. 1350, 1351).

Appellant's assertion that the Commonwealth had a "tacit agreement" with Mr. Weakley is categorically without support. The only thing that may be reasonably inferred from Mr. Weakley's testimony, in this context, is that he testified for exactly the reasons he repeatedly stated throughout both direct and extensive cross-examination. As should be evident from even a cursory review of his testimony, defense counsel aggressively peppered Mr. Weakley with multiple questions designed not only to demonstrate he was an admitted liar but also to establish his testimony was purchased by the Commonwealth to implicate Mr. Selenski and to "save himself".

Mr. Weakley's prior crimes were explored; his plea agreements extensively examined; the letters he forwarded to the Commonwealth indicating an unwillingness to testify identified and questioned. Mr. Weakley was vigorously questioned regarding multiple felonies,

unrelated to the present offense, committed in Luzerne County from which he literally walked away.

He was questioned regarding a long list of prior inconsistent statements concerning these murders and his purported lack of involvement. These included questions regarding his implication of innocent people in these killings to "misdirect" the focus from him.

We recall the prescient words of Judge Muroski in denying a motion to declare Mr. Weakley incompetent as a matter or law.[24]

> That Weakley has provided numerous prior inconsistent statements does not, as a matter of law, require or dictate the legal conclusion he is incompetent as that term is understood in Pennsylvania jurisprudence. Indeed, the Commonwealth candidly acknowledges that the information outlined in the defense motion and referenced by Defense counsel during the May 18, 2010 hearing can be employed to challenge Mr. Weakley's credibility.

> It is obvious there exists significant fodder for cross-examination, and potentially substantive evidence of his lack or credibility. It is also readily apparent that Mr. Weakley's credibility, or lack thereof, will be a crucial and significant issue for the jury to consider and resolve. The jury is free to conclude that Mr. Weakley is a serial liar or, on the other hand, that he was a willing participant in the heinous conduct which is alleged by the Commonwealth.

Having presided in this trial, it should be obvious to anyone with a modicum of experience in the criminal justice system and even a cursory understanding of the evidence presented, that once the jury resolved the

---

[24] Memorandum of July 21, 2010.

77

issue of credibility in favor of Mr. Weakley, Hugo Selenski's fate was clear.

END OF OPINION

ORDER ATTACHED AS PAGE 79